566 F.2d 890
 Lawrence J. CONTI, Appellee,
v.
NORFOLK AND WESTERN RAILWAY COMPANY, Appellant.
Simon S. SCARANO, Appellee,
v.
NORFOLK AND WESTERN RAILWAY COMPANY, Appellant.
George M. FUNK, Appellee,
v.
NORFOLK AND WESTERN RAILWAY COMPANY, Appellant.
 Nos. 76-2336 to 76-2338.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 3, 1977.
Decided Dec. 8, 1977.
 
 Edward L. Oast, Jr., and William T. Prince, Norfolk, Va., for appellant in Nos. 76-2336, 76-2337, and 76-2338.
 Raymond H. Strople, Portsmouth, Va. (Bernard Miller, Moody, McMurran & Miller, Ltd., Portsmouth, Va., on brief) for appellee in Nos. 76-2336 and 76-2337.
 William F. Burnside, Portsmouth, Va., for appellee in No. 76-2338.
 Before BUTZNER, Circuit Judge, FIELD, Senior Circuit Judge, and THOMSEN, Senior District Judge.*
 FIELD, Senior Circuit Judge:
 
 
 1
 In each of these three cases the plaintiff filed an action in the district court to recover damages under the provisions of the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51, et seq. The defendant filed a motion to dismiss in each case, asserting that at the time of their respective injuries the plaintiffs were engaged in maritime employment within the meaning of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901, et seq., which provides their exclusive remedy. The district court denied the dismissal motions and the cases proceeded to trial and judgment. The only issue on these appeals is whether the district court properly concluded that the plaintiffs were not maritime employees under the LHWCA.
 
 
 2
 The facts are not disputed. The defendant, Norfolk and Western Railway Company (N&W), is a railroad carrier with its eastern terminus at Lamberts Point on the Elizabeth River in Norfolk, Virginia. The transportation of coal is the largest single revenue source for the N&W, and the export coal is loaded on vessels at the Lamberts Point Yards and Piers which are operated by the N&W.
 
 
 3
 The export coal originates in the mines in Kentucky, Virginia, and West Virginia and is placed in hopper cars at the mines. The coal is brought to the eastern seaboard by trains usually consisting of some 275 loaded coal cars. Upon reaching the Norfolk terminal the cars are stored in the Portlock Yard and thereafter are moved to the classification yards at Lamberts Point. Upon orders of the yardmaster, the cars are moved from the classification yards to the Barney Yard by a "hump" crew to await loading aboard vessels at Pier 6. Cuts of loaded cars are placed on the 32 tracks of the Barney Yard all of which lead to Pier 6 and slope downhill in the direction of the pier. It is, of course, necessary that a brakeman in the Barney Yard set the brakes on each car to prevent it from rolling forward.
 
 
 4
 When a car is scheduled to go to the dumpers a brakeman uncouples it from the line of cars and releases the brakes. Due to the slope of the tracks the car will ordinarily commence to roll freely. However, if the car fails to roll a brakeman will use a pinch bar or teaser to start it moving. The speed of the moving car toward the scale is controlled by a radar-operated retarder, and if the speed of the car exceeds four miles per hour an automatic braking system will cause it to slow down. The car then passes over scales which automatically record the weight, and it continues to roll toward the thawing chamber which is designed to emit heat sufficient to thaw any snow or ice that may be in the coal so that it will flow easily. The car then rolls to the Barney pit where it comes to a complete stop. At that point a brakeman positions the car automatically and operates the cut levers on the car to separate it from other cars in the pit area. Two cars are then shoved forward on parallel tracks to a position where a mechanical device called a Barney Yard "mule" pushes the cars up an incline to the dumpers. As the cars reach the dumpers they are picked up mechanically, turned upside down, and the coal falls into a hopper or receiving bin. The coal is then transported by an underground conveyor belt to the shiploaders on the pier where it is loaded into the hold of a ship by a telescopic arm on the shiploader.
 
 
 5
 After the coal has been dumped into the bin, the car is mechanically returned to an upright position and pushed forward down an incline by the car that has next come on to the dumper. The speed of the empty car is checked and its direction reversed by the upgrade of the track called the kickback. When the car reaches a point on the upgrade it comes to a stop and then commences to roll backwards. The car is then automatically switched to another track and rolls down into the "Empty Car Yard." Yard crews of the N&W take the empty cars out of this yard and ultimately they are assembled into trains for the return trip to the coal fields.
 
 
 6
 During a normal operation some twenty brakemen are assigned to the Barney Yard, together with one to three car retarder operators, two yard foremen and two yard conductors. Brakemen who are assigned to work in the Barney Yard also work in various other yards in the Norfolk terminal and are governed by the same operating and safety rules as other brakemen, conductors and engineers in the N&W system. None of the brakemen ever have occasion to go to Pier 6 or aboard a ship, nor do they ever operate the dumper or loader. The deck foreman, certain clerical workers and motive power personnel are the only employees of the N&W who work on the pier or go aboard the ships.
 
 CONTI
 
 7
 Conti was employed as a brakeman by the N&W, and on March 8, 1975, was working in the Barney Yard at a point where loaded cars were being brought into the yard by the "hump" crews. Conti was responsible for tying brakes, uncoupling levers, giving signals, inspecting cars, and starting cars on their way to the scales and dumpers. He had moved several loaded coal cars a short distance with a pinch bar and had then uncoupled the lead car and was using the pinch bar to start it forward. At that time the "hump" crew knocked a string of cars into the car which Conti was pinching, causing the bar to fly out and injure his leg.
 
 SCARANO
 
 8
 Scarano was employed as a conductor-brakeman by the N&W and on January 22, 1975, was working in the Barney Yard where he was engaged in pinching loaded coal cars toward the dumper. For some reason, a car at the dumper was not unloaded and Scarano was instructed to ride the loaded car from the dumper to the kickback and then back to the empty yard. Scarano rode the car to the empty yard where he braked it to a halt some 1,000 yards from Pier 6. He then left the car and was walking toward the brakemen's shack when he fell in an unlighted ditch and injured himself.
 
 FUNK
 
 9
 Funk was employed by the N&W as a Barney Yard brakeman, and on April 23, 1975, was working at the south kickback which was outboard or seaward of the Pier 6 south dumper. It was his assignment at that time to make certain that the knuckles on the cars were closed after they had been dumped. Two loaded cars were being brought up to the dumper and when they hit the empty cars they became coupled. It was necessary to stop the shiploading operation until the two empty cars were pulled out from the dumper. Funk was attempting to pull the cars by use of a hook and winch, and while trying to hold the hook in place he injured his right hand.
 
 
 10
 Disposition of these appeals requires that we examine the area and occupational nature of the plaintiffs' activities at the time of their injuries in the light of the amendments of three sections of the LHWCA which were made in 1972. These sections, with the amendatory language italicized, now provide in pertinent part as follows:
 
 LHWCA, § 2(3), 33 U.S.C. § 902(3):
 
 11
 The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.
 
 LHWCA, § 2(4), 33 U.S.C. § 902(4):
 
 12
 The term "employer" means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).
 
 LHWCA, § 3(a), 33 U.S.C. § 903(a):
 
 13
 Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).
 
 
 14
 We first had occasion to consider these amendments in I. T. O. Corp. of Baltimore v. Ben. Rev. Bd., etc., 4 Cir., 529 F.2d 1080 (1975). In his opinion for the panel majority in that case Judge Winter, after an extensive review of the background and legislative history of the amendments, summarized them as follows:
 
 
 15
 Sections 2 and 3 of the present Act establish a dual test for coverage. The situs requirement has been retained, with the definition of "navigable waters" expanded to include certain specified land areas. In addition, a new "status" test has been added: the person injured ("employee") must have been engaged in "maritime employment," a concept which is nowhere defined but which includes "longshoring operations." The net effect of the 1972 Amendments was therefore to broaden the area in which an injury would be covered, and narrow the class of persons eligible according to job function. Id. 1083.
 
 
 16
 In searching for an effective "status" test to determine when an employee is "engaged in maritime employment" the panel majority in I.T.O. adopted the so-called "point of rest" theory. The panel's decision was modified to some degree by the court sitting en banc, 542 F.2d 903 (1976), and while certiorari was pending the Supreme Court handed down its decision in Northeast Marine Terminal Co., Inc. v. Caputo, --- U.S. ----, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977).[1] Shortly thereafter the Court vacated our judgment in I.T.O. and remanded for further consideration in the light of Northeast, --- U.S. ----, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). The Court's decision in Northeast is, of course, the benchmark in our consideration of the present appeals.
 
 
 17
 Blundo, one of the respondents in Northeast, had been employed for several years as a "checker" by a terminal company at its Brooklyn pier. As a checker Blundo was responsible for checking and recording cargo as it was loaded onto or unloaded from vessels, barges or containers. From day to day Blundo was assigned to work either on a ship or on shore. On the day of his injury he was checking cargo which was being removed from a container on the pier.
 
 
 18
 The other respondent, Caputo, was a member of a regular longshoring "gang" that worked for a stevedoring company. When his gang was not needed, Caputo went to a hiring hall and was hired by the day by other stevedoring companies or terminal operators who had work available. He had at times been hired to work as a member of a stevedore gang on ships at a pier in Brooklyn, and on other occasions had been hired by Northeast for work in its terminal operations at the same location. On the day of his injury Caputo had been hired by Northeast to perform "terminal labor," and was assigned to assist consignees' truckmen load their trucks with cargo which had been discharged from ships at the terminal. While so engaged Caputo was injured.
 
 
 19
 The Court had little difficulty in concluding that Blundo satisfied the status test. Noting the Congressional intent to adapt the LHWCA to modern cargo handling techniques, the Court stated that Blundo's task of checking items of cargo as they were unloaded from a container was "clearly an integral part of the unloading process as altered by the advent of containerization and was intended to be reached by the Amendments." --- U.S. ---, 97 S.Ct. 2361.
 
 
 20
 With respect to Caputo, the Court observed that the Congressional desire to accommodate the Act to modern technology was irrelevant "since he was injured in the old-fashioned process of putting goods already unloaded from a ship or container into a delivery truck." Id. The Court recognized, however, that another objective of Congress was to achieve a uniform compensation system which "did not depend on the 'fortuitous circumstance of whether the injury (to the longshoreman) occurred on land or over water'," Id. and, accordingly "extended the situs to encompass the waterfront areas where the overall loading and unloading process occurs." Id.
 
 
 21
 The Director of the Office of Workers' Compensation Programs had urged upon the Court the view that "maritime employment", as used in the Amendments, should include "all physical tasks performed on the waterfront, and particularly, those tasks necessary to transfer cargo between land and water transportation." Id., --- U.S. at ----, 97 S.Ct. at 2361. The Court, however, found it unnecessary to pass upon the validity of the Director's position, stating:It is clear, at a minimum, that when someone like Caputo performs such a task, he is to be covered. The Act focuses primarily on occupations longshoreman, harbor worker, ship repairman, shipbuilder, shipbreaker. Both the text and the history demonstrate a desire to provide continuous coverage throughout their employment to these amphibious workers who, without the amendments, would be covered only for part of their activity. It seems clear, therefore, that when Congress said it wanted to cover "longshoremen," it had in mind persons whose employment is such that they spend at least some of their time in indisputably longshoring operations and who, without the amendments, would be covered for only part of their activity. Id., --- U.S. at ----, 97 S.Ct. at 2362.
 
 
 22
 To us the nub of the Court's decision is that an employee who is not engaged in "an integral part of the unloading process" will not fall within the coverage of the Act unless his occupation is of a traditional maritime nature. This was the construction placed upon the statutory language by the Ninth Circuit in Weyerhauser Company v. Gilmore, 528 F.2d 957, 961 (1976), cert. denied 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976):
 
 
 23
 We hold that for an injured employee to be eligible for federal compensation under (the Act), his own work and employment, as distinguished from his employer's diversified operations, including maritime, must have a realistically significant relationship to "traditional maritime activity involving navigation and commerce on navigable waters," with the further condition that the injury producing the disability occurred on navigable waters or adjoining areas as defined in § 903. (Citations omitted).
 
 
 24
 It is clear that in the cases before us the occupations of the plaintiffs were not of a traditionally maritime nature, but on the contrary were those traditionally associated with railroading. Their tasks and responsibilities with respect to the unloading of the coal from the hopper cars would have been the same at an inland terminal as they were at Lamberts Point, and the sophisticated automation of the facilities at the latter terminal should not obscure the basic fact that the plaintiffs were engaged in unloading a coal train, not loading a vessel. We find nothing in the Amendments or the legislative history to indicate that under these circumstances the Congress intended to transfer the redress of such injured railroad workers from the FELA to the Longshoremen's Act.
 
 
 25
 Since we agree with the district court that the plaintiffs were not engaged in maritime employment at the time of their injuries, the judgments are affirmed.
 
 
 26
 AFFIRMED.
 
 
 
 *
 Honorable Roszel C. Thomsen, District of Maryland, sitting by designation
 
 
 [1]
 Consolidated with No. 76-454, International Terminal Co., Inc. v. Blundo, et al., also on certiorari to the same court