Greg **HAYES**, Plaintiff–Appellant,

v.

**CSX TRANSPORTATION, INCORPORATED, a Corporation, Defendant–Appellee.**

No. 92–1706.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 30, 1992.

Decided Jan. 22, 1993.

---

**138**

Paul J. Passanante, Gray & Ritter, P.C., St. Louis, MO, argued (Benjamin A. Neil, Benjamin A. Neil & Associates, Baltimore, MD, on the brief), for plaintiff-appellant.

Stephen Bennett Caplis, Whiteford, Taylor & Preston, Baltimore, MD, argued (H. Russell Smouse, Whiteford, Taylor & Preston, on the brief), for defendant-appellee.

Before NIEMEYER, Circuit Judge, and SPROUSE and CHAPMAN, Senior Circuit Judges.

## OPINION

CHAPMAN, Senior Circuit Judge:

The issue is whether the appellant Greg Hayes was engaged in maritime employment so that his exclusive remedy for injuries arising out of his employment with CSX Transportation, Inc. (CSX) is under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901–950 (1988), and not under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51–60 (1988). We agree with the district court that the appellant was engaged in maritime employment at the time of his injury and may only seek relief under the LHWCA. Therefore, we affirm.

### I.

Greg Hayes was hired as a carman in 1980 by a predecessor of CSX. He worked at various locations until 1988 when he was assigned to Seagirt Terminal, also known as Dundalk Marine Terminal. Hayes worked for CSX as a carman, as a car inspector and assisted in the loading and unloading of trailers and containers (trailer bodies without wheels) on and off of flat-bed rail cars.

Seagirt is an intermodal freight facility in Baltimore. Freight arrives at Seagirt and is taken from Seagirt by ship, truck and train. CSX Intermodal is in charge of the operation, and the property and equipment is leased to CSX Intermodal by the Maryland Port Authority. There are seven railroad tracks at Seagirt, but the carmen work only four of these tracks, each of which is approximately three quarters of a mile in length.

The containers or trailers are removed from or placed on the flat-bed rail cars by cranes. The cranes are operated by employees of Ceres Corporation, and such employees are longshoremen and members of the International Longshoremen Association (ILA). Greg Hayes and the other carmen employed by CSX work with the crane operators daily in the loading and unloading operation. During the loading and unloading procedure, the carman guides the crane operator as the crane lowers a container or a trailer onto the flat-bed car, and then the carman locks the container or trailer in place. From 120 to 180 containers or trailers are loaded onto an outbound train. When a ship unloads containers, longshoremen, referred to as "jockeys," bring the containers to the Seagirt railroad area for loading onto the flat-bed cars. When containers are moved from the flat-bed cars for transportation on a ship, the carman assists the crane operator in removing the container from the flat-bed car and then the jockey moves the container to the ship.

Neither party presented any estimate as to how many of the containers loaded onto an outbound train come to the terminal by ship and how many arrive either by truck or train. Nor was there any evidence as to the percent of containers that arrive by

train and leave the terminal by either ship, truck or train.

When Hayes is engaged in unloading an incoming train, his job requires him to mount the flat-bed car, unlock the hitch and then guide the crane operator by signals as the crane removes the container. He serves in the same capacity as containers are loaded onto flat-bed rail cars. In these operations, it is Hayes's job to guide the crane operator in such a way as to prevent damage to the container, the rail car, the crane or any personnel.

At the time of appellant's injury, he had just finished loading a container on one track and received a call to load a trailer at the end of another track, about three-quarters of a mile away. Hayes was standing near the crane when it began to move to another location. The door to the cab of the crane suddenly opened and struck Hayes in the head. The origins or destinations of the loads being worked at the time are unknown.

The present action was commenced in United States District Court for the District of Maryland under FELA. After a period of discovery, CSX made a motion for summary judgment on the ground that the LHWCA provided the exclusive remedy for the plaintiff. The district court agreed and granted defendant's motion.

## II

■ Section 5(a) of the LHWCA provides in part: "The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee...." 33 U.S.C. § 905(a). A railroad employee, who is covered by the LHWCA, may not pursue an action under FELA. *Chesapeake & Ohio Ry. v. Schwalb*, 493 U.S. 40, 42, 110 S.Ct. 381, 383, 107 L.Ed.2d 278 (1989), *Vogelsang v. Western Md. Ry.*, 670 F.2d 1347–48 (4th Cir.1982).

In 1927, after it had concluded that state workers' compensation programs could not be made applicable to maritime workers injured on navigable waters, Congress enacted the LHWCA which created a federal system to compensate employees for injuries arising out of and in the course of their employment. Initially, the LHWCA only provided coverage for injuries occurring "upon navigable waters of the United States." 33 U.S.C. § 903(a) (1970) (current version at 33 U.S.C. § 903(a) (1988)). Over the years, confusion, incongruity and unfairness developed. A longshoreman injured while working on a pier or dock was not covered by the Act, but a longshoreman involved in loading the same piece of cargo, and injured while standing about the ship, was covered. In 1972, the LHWCA was amended to increase the benefits payable to injured workers and to extend the coverage shoreward by broadening the definition of "navigable waters of the United States" to include "any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel." 33 U.S.C. § 903(a).

In *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977), the court reviewed the 1972 amendments and concluded that they "changed what had been essentially only a 'situs' test of eligibility for compensation to one looking to both the 'situs' of the injury and the 'status' of the injured." *Id.* at 264–65, 97 S.Ct. at 2357. The Court also recognized that one of the reasons for the extension of coverage shoreward was the recognition by Congress that:

> "the advent of modern cargo-handling techniques" had moved much of the longshoreman's work off the vessel and onto land. S.Rep. 13; H.R.Rep. 10. Noted specifically was the impact of containerization. Unlike traditional break-bulk cargo handling, in which each item of cargo must be handled separately and stored individually in the hold of the ship as it waits in port, containerization permits the time-consuming work of stowage and unstowage to be performed on land in the absence of the vessel. The use of containerized ships has reduced the costly time the vessel must be in port and the amount of manpower required to get the cargo onto the vessel. In effect, the operation of loading and unloading has been moved shoreward; the contain-

er is a modern substitute for the hold of the vessel.

*Id.* at 269–70, 97 S.Ct. at 2360.

The parties are in agreement that appellant Hayes meets the "situs" test. His injuries occurred while he was on an adjoining pier or terminal used for loading and unloading. This case turns on whether Hayes also satisfies the "status" test—that is, whether he was engaged in maritime employment at the time of his injury.

In *Northeast Marine Terminal,* the injured employee Caputo was a terminal laborer assigned to load and unload containers, lighters, barges and trucks. He was injured while helping a consignee's truckmen load their trucks with cargo that had been discharged from ships at Northeast Marine Terminal. His injury occurred while he was rolling a dolly loaded with cheese into a consignee's truck. The court found that Caputo was covered by the LHWCA while he was helping load the consignee's truck. It based coverage, however, on the fact that Caputo was a longshoreman and a member of a regular stevedoring gang, who participated aboard ship and on the pier in the unloading and stowage of cargo. The court concluded that to exclude him from coverage because he was injured while loading goods onto a consignee's truck, but acknowledging that he would have been covered if his injury had occurred while unloading the same cargo from a ship, would produce the inconsistency and incongruity that Congress sought to avoid by the 1972 amendments.

*Northeast Marine Terminal* put an end to the point-of-rest theory, which held that maritime employment included only that portion of the unloading process that occurs before the stevedores place the cargo on the dock. Under such test, only workers employed to seaward of the last point-of-rest were covered. *Northeast Marine Terminal* found this theory to be inconsistent with the congressional intent expressed in the 1972 amendments. *Id.* at 275–276, 97 S.Ct. at 2363.

The point-of-rest test did not accommodate the congressional desire to extend coverage to those involved in the loading and unloading process and transferring the cargo from sea to land transportation. The old test did not consider the change in stevedoring occasioned by containerization. Retaining point-of-rest would have perpetuated the bifurcated coverage for the same employment that the 1972 amendment sought to end.

In deciding if an employee is covered, *Northeast Marine Terminal* gives considerable weight to those activities that are an integral part of or essential to the loading or unloading process. This is consistent with the language in the 1972 amendment.

In *P.C. Pfeiffer Co. v. Ford,* 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979), the court considered the claim of Ford, who injured his hand with a hammer while working on a public dock. Ford was in the process of fastening a military vehicle onto a railroad flat car. The vehicle had arrived by ship and had been stored for several days before being loaded onto the flat car. Ford was not an employee of the railroad, but he was working out of a warehousemen's local. Under labor contracts among the employer, the Warehousemen's Union and the Longshoremen's Union, the warehousemen could not "move cargo directly from a vessel either to a point of rest in storage or to a railroad car. Nor may they move cargo from a shore side point of rest directly onto a vessel. These jobs [were] reserved for longshoremen." *Id.* at 71, 100 S.Ct. at 331.

In *Pfeiffer,* the court also considered the case of Will Bryant, who was injured while unloading a bale of cotton from a dray wagon into a pier warehouse. At the time he was working for Ayers Steamship Co. The cotton arrived from inland shippers and was stored in pier warehouses by cotton headers such as Bryant. Later longshoremen moved the cotton from the pier warehouses onto the ships. Under the union contracts, cotton headers could only load cotton off dray wagons into the pier warehouses or move cotton within the warehouses. Cargos of cotton moved directly from the ship to shoreside transportation, or directly from shoreside transportation to the ship were required to be handled only by longshoremen. *Id.* at 71–72, 100 S.Ct. at 331–32. The *Pfeiffer* court

held that "maritime employment" was an occupational and not a geographical concept, and that it was determined solely by what an employee was doing and never by where he was working. "In adopting an occupational test that focuses on loading and unloading, Congress anticipated that some persons who work only on land would receive benefits under the 1972 Act." *Id.* at 80, 100 S.Ct. at 336. The court held that Ford was performing normal longshoremen duties in fastening the military vehicles to the railroad flat cars, because absent the union contract, this task would have been done by a longshoreman and not by a warehouseman. The court also found that Bryant was the kind of land-based employee Congress intended to cover by the Act.

Both men engaged in the type of duties that longshoremen perform in transferring goods between ship and land transportation. If the cotton that Bryant was unloading had been brought directly from the compress-warehouse to a ship, his task of moving the cotton off a dray wagon would have been performed by a longshoreman. Similarly, longshoremen—not warehousemen like Ford—would fasten military vehicles onto railroad flat cars if those vehicles went directly from a ship to the railroad cars. The only basis for distinguishing Bryant or Ford from longshoremen who otherwise would perform the same work is the point-of-rest theory. That is, longshoremen in the Ports of Beaumont and Galveston would have performed the work done by Bryant and Ford had the cargo moved without interruption between land and sea transportation. Our unanimous opinion in *Northeast Marine Terminal* expressly decided that application of the point-of-rest test to define the scope of maritime employment would be contrary to congressional intent. Thus, there is no principled basis for distinguishing Ford and Bryant from longshoremen who have been injured while performing the same task.

We believe that § 2(3)'s explicit use of the terms "longshoremen" and "other persons engaged in longshoring operations" to describe persons engaged in maritime employment demonstrates that workers doing tasks traditionally per-

formed by longshoremen are within the purview of the 1972 Act. We do not suggest that the scope of maritime employment depends upon the vagaries of union jurisdiction. Instead, the crucial factor is the nature of the activity to which the worker may be assigned. Persons moving cargo directly from ship to land transportation are engaged in maritime employment. A worker responsible for some portion of that activity is as much an integral part of the process of loading or unloading a ship as a person who participates in the entire process. We therefore hold that Ford and Bryant were engaged in maritime employment because they were engaged in intermediate steps of moving cargo between ship and land transportation.

*Id.* at 81–83, 100 S.Ct. at 336–38 (citations omitted).

■ Ford was performing basically the same job as the present plaintiff Hayes-fastening the cargo onto a flat-bed railroad car. The only difference is that Hayes was employed by the railroad and Ford was employed by a warehouse company. This difference, however, does not reduce the reach of the 1972 amendments nor does it require a different result. Employees of railroads are covered by LHWCA when they are engaged in maritime employment and the remedy provided by such act is exclusive, and employees covered by LHWCA may not resort to the remedies provided by FELA. *Chesapeake & Ohio Ry. v. Schwalb*, 493 U.S. 40, 42, 110 S.Ct. 381, 383, 107 L.Ed.2d 278 (1989).

Schwalb was employed as a laborer at the Chesapeake & Ohio Railways terminal in Newport News, Virginia, doing housekeeping and janitorial work. Among her duties was the cleaning of spilled coal from beneath the conveyor belts that moved coal from Chesapeake & Ohio's railroad cars to the loading tower from which the coal was poured into the hold of a ship. She was injured when she fell from a catwalk in the dumper area. Her appeal was consolidated with that of another Chesapeake & Ohio employee performing the same duties and the appeal of a Norfolk & Western Railroad employee, who worked as a mechanic

maintaining and repairing loading equipment at Norfolk & Western's loading terminal in Norfolk, Virginia. All of the employees claimed the right to proceed against their employers under FELA. The employers claimed the employees were confined to the exclusive remedies of LHWCA.

In *Schwalb,* the court extended its holdings in *Northeast Marine Terminal* and *Pfeiffer* that the occupational test focuses on the loading and unloading process so as to include employees injured while maintaining or repairing equipment essential to the loading and unloading process.

> Although we have not previously so held, we are quite sure that employees who are injured while maintaining or repairing equipment essential to the loading or unloading process are covered by the Act. Such employees are engaged in activity that is an integral part of and essential to those overall processes. That is all that § 902(3) requires. Coverage is not limited to employees who are denominated 'longshoremen' or who physically handle the cargo. Nor are maintenance employees removed from coverage if they also have duties not integrally connected with the loading or unloading functions. Someone who repairs or maintains a piece of loading equipment is just as vital to and an integral part of the loading process as the operator of the equipment. When the machinery breaks down or becomes clogged or fouled because of the lack of cleaning, the loading process stops until the difficulty is cured. It is irrelevant that an employee's contribution to the loading process is not continuous or that repair or maintenance is not always needed. Employees are surely covered when they are injured while performing a task integral to loading a ship.

493 U.S. at 47, 110 S.Ct. at 385.

■ Under the clear holdings of the Supreme Court since the 1972 amendments to the LHWCA, it is obvious that Hayes was engaged in maritime employment at the time of his injury. He was engaged in completing the unloading process and in moving the cargo from ship to land transportation. His assistance to the crane operator in locating the cargo on the flat-bed railroad car, and his fastening the load in place were integral to the unloading process. His injury resulted from being struck by the door of a crane, equipment that was essential to the unloading process, and at a time when he had just assisted in the loading of a container onto a flat-bed railroad car and was walking to another location in the terminal to assist in additional loading and unloading.

Hayes invites us to distinguish cases in which injured employees seek protection under LHWCA from those cases in which employers seek to use the exclusive remedy provisions of such act to shield themselves from the possibility of larger verdicts under FELA. The Supreme Court clearly answered this argument in *Schwalb* in which all three plaintiffs were railroad employees and sought relief under FELA, but were found by the court to be covered exclusively by LHWCA.

Appellant also seeks support from *Conti v. Norfolk and Western Railway,* 566 F.2d 890 (4th Cir.1977) in which our court found that three brakemen working for Norfolk and Western Railway at its Lamberts Point terminal were not covered by the LHWCA because their occupation was not of a traditional maritime nature, but was traditionally associated with railroading. As we explained in *Vogelsang v. Western Maryland Railway Co.,* 670 F.2d 1347, 1348 (4th Cir. 1982), the employees in *Conti* were not engaged in an integral part of the loading or unloading process. They were engaged in moving the train. Hayes, however, was engaged in employment of a traditionally maritime nature because his duties in directing the crane and fastening the cargo were an integral part of the ship unloading process. Therefore, *Conti* is not applicable to the facts presently in this appeal.

Appellant cites *Herb's Welding, Inc. v. Gray,* 470 U.S. 414, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985). But we find that it does not strengthen his case. Gray was injured while working on a stationary offshore oil drilling platform, and the Court held that he was not involved in the loading or unloading process, and that the " 'maritime employment' requirement is 'an occupational test that focuses on loading and unloading.' " *Id.* at 424, 105 S.Ct. at 1427.

Clearly, Hayes was engaged in an integral and essential part of the loading and unloading process and the district court was correct in holding the LHWCA to be his exclusive remedy.

AFFIRMED.