**Antoinette Y. ETHERIDGE,
Plaintiff–Appellant,**

v.

**NORFOLK & WESTERN RAILWAY
COMPANY, Defendant–Appellee.**

No. 91–1074.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 29, 1993.

Decided Nov. 10, 1993.

Eddie Wayne Wilson, Wilson & Associates, P.C., Norfolk, VA, argued for plaintiff-appellant.

John Y. Richardson, Jr., argued (Joan F. Martin, on brief), Williams, Kelly & Greer, P.C., Norfolk, VA, for defendant-appellee.

Before ERVIN, Chief Judge, and MURNAGHAN and WILKINS, Circuit Judges.

## OPINION

WILKINS, Circuit Judge:

Antoinette Y. Etheridge brought this action against Norfolk & Western Railway Company (N & W) under the Federal Employers' Liability Act (FELA), 45 U.S.C.A. §§ 51–60 (West 1986), alleging that she was injured while employed by N & W as a result of the railroad's negligence. The district court granted N & W's motion to dismiss, reasoning that Etheridge's exclusive remedy was found in the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C.A. §§ 901–50 (West 1986). We affirm.

### I.

The pertinent facts underlying this appeal are undisputed. Etheridge was employed as a brakeperson at N & W's Lambert's Point terminal, located adjacent to the Elizabeth River in Norfolk, Virginia, where coal is loaded from railroad cars onto ships on navigable waters. The Lambert's Point terminal receives, processes, and stores railroad cars filled with coal until ships are ready to be loaded. In order for coal to be loaded aboard ships, the railroad cars are moved from storage facilities to a location called the Barney Yard, which adjoins the piers. The railroad tracks in the Barney Yard are sloped toward the pier to facilitate loading of

the ships. As a result, a brakeperson must set the brakes on railroad cars moved into the Barney Yard to prevent them from rolling toward the pier prior to loading. When it is time for a particular car to be loaded, a brakeperson releases the brake, and typically, because of the slope of the tracks, the car will move toward the pier unassisted. However, if the car does not roll freely, a brakeperson must use a "pinch bar" or "teaser" to prod it along. After the car begins its descent, it passes over scales and through a thawing shed. It is then pushed up an incline by a mechanical device to mechanical arms that hoist the car into the air and turn it upside down, dumping the coal onto a conveyer belt. This belt then transports the coal into the hold of the ship, and the empty railroad car is returned to a storage facility.

On August 12, 1990, Etheridge was using a "pinch bar" to prod a railroad car toward the pier. She claims that the bar slipped on some excess grease on the track, causing injury to her wrist. Although Etheridge began receiving benefits under the LHWCA shortly thereafter, on December 27, 1990 she filed this FELA action, claiming that N & W had been negligent in permitting the grease to remain on the track. The district court granted N & W's motion to dismiss Etheridge's complaint on the basis that the LHWCA provides her exclusive remedy. Etheridge appeals.

## II.

■ Congress enacted the LHWCA to provide compensation for maritime workers injured on navigable waters in order "to fill the void created by the inability of the States to remedy injuries on navigable waters." *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 258, 97 S.Ct. 2348, 2354, 53 L.Ed.2d 320 (1977). Prior to amendments adopted in 1972, the LHWCA covered only those injuries occurring over navigable waters. *See id.* at 259–60, 97 S.Ct. at 2354–55. In the 1972 amendments, however, Congress extended coverage of the LHWCA to injuries occurring on shore by expanding the definition of " 'navigable waters of the United States' to include 'any adjoining pier, wharf, dry dock, terminal, building way, marine rail-

way, or other adjoining area customarily used by an employer in loading, unloading, repairing, [dismantling,] or building a vessel.' " *Id.* at 263, 97 S.Ct. at 2357 (quoting 33 U.S.C.A. § 903(a)). This change was intended to end the inequitable and confusing results that followed from the requirement that the injury occur on navigable waters. *Id.* at 262–63, 97 S.Ct. at 2356–56. Although the 1972 amendments extended coverage under the LHWCA onto shore, they established an additional requirement that an employee "be 'engaged in maritime employment.' " *Id.* at 264, 97 S.Ct. at 2357 (quoting 33 U.S.C.A. § 902(3)). Thus, the LHWCA provides for compensation for an employee's injury when four elements are satisfied: The employer must be a maritime employer, 33 U.S.C.A. § 902(4); the injury must have occurred in the course of employment, 33 U.S.C.A. § 902(2); the injury must have occurred on a maritime situs, 33 U.S.C.A. § 903(a); and the employee must have been engaged in "maritime employment," 33 U.S.C.A. § 902(3). If these requirements are satisfied, the LHWCA provides the exclusive remedy to covered employees and prevents those employees from suing their employer in tort. *See* 33 U.S.C.A. § 905(a). The parties agree that N & W is a maritime employer, that Etheridge's injury occurred in the course of her employment, and that the Lambert's Point terminal is a maritime situs. The sole issue presented is whether Etheridge was engaged in "maritime employment" within the meaning of § 902(3).

■ The LHWCA does not define what constitutes maritime employment. However, in *Northeast Marine Terminal Co.*, the Supreme Court held that, aside from specific occupations identified in the LHWCA, land-based activity is considered maritime employment only if it is an integral or essential part of loading or unloading a vessel. *See Northeast Marine Terminal Co.*, 432 U.S. at 265–79, 97 S.Ct. at 2358–65. In *Conti v. Norfolk & Western Railway Co.*, 566 F.2d 890 (4th Cir.1977), this court considered whether individuals employed as brakepersons in the Barney Yard at the Lambert's Point terminal, one of whom was performing a task indistinguishable from the task Ether-

idge was performing, were engaged in maritime employment. Examining the then recent opinion in *Northeast Marine Terminal Co.,* we stated:

> To us the nub of the [*Northeast Marine Terminal Co.*] decision is that an employee who is not engaged in "an integral part of the unloading process" will not fall within the coverage of the Act unless his occupation is of a traditional maritime nature....
>
> It is clear that in the cases before us the occupations of the plaintiffs were not of a traditionally maritime nature, but on the contrary were those traditionally associated with railroading. Their tasks and responsibilities with respect to the unloading of the coal from the hopper cars would have been the same at an inland terminal as they were at Lambert's Point, and the sophisticated automation of the facilities at the latter terminal should not obscure the basic fact that *the plaintiffs were engaged in unloading a coal train, not loading a vessel.*

*Id.* at 895 (emphasis added). Undoubtedly, if *Conti* remains controlling authority, this panel is bound to conclude that Etheridge was not engaged in maritime employment.

After *Conti* was decided, however, the Supreme Court in *Chesapeake & Ohio Railway Co. v. Schwalb,* 493 U.S. 40, 110 S.Ct. 381, 107 L.Ed.2d 278 (1989), addressed the question of whether railroad employees who were employed at coal loading facilities in Virginia were engaged in maritime employment for purposes of applying the LHWCA. The Court was called upon to address whether laborers doing janitorial work removing coal that had fallen off conveyer belts moving the coal into the hold of the ship and a maintenance worker repairing this loading equipment were engaged in maritime employment. *Id.* at 43–48, 110 S.Ct. at 383–86. The Court held that both types of employment were integral parts of the loading process and, therefore, were maritime employment. *Id.* at 48, 110 S.Ct. at 386. In so holding, the Court rejected the argument that because the type of employment in which the employees were engaged was usually done by railroad employees, it was not maritime employ-

ment. *Id.* The Court stated, "*It makes no difference* that the particular kind of repair [the employee] was doing *might be considered traditional railroad work or might be done by railroad employees wherever railroad cars are unloaded.*" *Id.* (emphasis added). Thus, by concluding that whether employment constitutes traditional railroad employment is irrelevant to determining whether employment is "maritime employment" within the meaning of § 902(3), the *Schwalb* Court specifically repudiated the reasoning upon which this court based its *Conti* decision.

The *Schwalb* Court instructed that the proper inquiry to determine whether employment is maritime employment within the meaning of § 902(3) is whether it is essential to the loading process. *Id.* at 45–48, 110 S.Ct. at 384–86. Our focus, then, must be on whether Etheridge's employment was integral or essential to the loading process. Describing the Virginia facility addressed in *Schwalb,* which is virtually identical in pertinent respects to the Lambert's Point terminal, the Court stated, "*The loading process begins* when a hopper car is rolled down an incline to a mechanical dumper which ... dumps the coal through a hopper onto conveyor belts." *Id.* 42–43, 110 S.Ct. at 383 (emphasis added). We believe that this statement makes plain that a brakeperson in the Barney Yard, who initiates the descent of railroad cars to the pier, begins the loading process and, therefore, engages in employment that is essential to the loading process. *See also Patterson v. CSX Transp., Inc.,* 245 Va. 483, 429 S.E.2d 215, 217 (1993) (holding in light of *Schwalb* that a "switch operator"— a railroad employee responsible for switching trains to a "boat track" spur that descended to the shore—was engaged in maritime employment because the activity "constituted the inception of the loading process").

■ A decision of a panel of this court becomes the law of the circuit and is binding on other panels unless it is overruled by a subsequent en banc opinion of this court or "a superseding contrary decision of the Supreme Court." *Busby v. Crown Supply, Inc.,* 896 F.2d 833, 840–41 (4th Cir.1990). We conclude that the decision of the Supreme Court in *Chesapeake & Ohio Railway Co. v. Schwalb* specifically rejected the rea-

soning on which our decision in *Conti* was based and that, accordingly, *Conti* is no longer a correct statement of the law. Consequently, the holding in *Conti* is no longer controlling.*

### III.

Etheridge's employment required her to initiate the loading process and, therefore, as *Schwalb* makes plain, was essential to the loading process. Consequently, Etheridge was engaged in maritime employment within the meaning of § 902(3) and, in light of her concessions that the other requirements have been met, her exclusive remedy is under the LHWCA. Thus, we hold that the district court properly dismissed Etheridge's claim under FELA.

*AFFIRMED.*

---

* This court recently addressed the question of "maritime employment" and held that an employee was engaged in maritime employment because his work in fastening down cargo to flatbed railroad cars was the completion of the unloading process and was, therefore, integral to the unloading process. *Hayes v. CSX Transp., Inc.,* 985 F.2d 137 (4th Cir.1993). We distinguished *Conti,* writing:

> Appellant also seeks support from [*Conti*] in which our court found that three brakemen working for [N & W] at its Lambert's Point terminal were not covered by the LHWCA because their occupation was not of a traditional maritime nature, but was traditionally associated with railroading. As we explained [previously], the employees in *Conti* were not engaged in an integral part of the loading or unloading process. They were engaged in moving the train.... Therefore, *Conti* is not applicable to the facts presently in this appeal.

*Id.* at 142. Because the type of employment at issue in *Hayes* was distinguishable from that at issue in *Conti,* a decision that *Conti* is no longer a correct statement of the law was unnecessary. We note, however, that our conclusion that Etheridge was engaged in maritime employment is consistent with our decision in *Hayes.*