**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

WILLIAM A. WHITE,

*Defendant-Appellee,*

v.

UNIVERSITY OF DELAWARE; SOUTH
HARRISON TOWNSHIP (NJ) POLICE
DEPARTMENT,

*Movants.*

No. 10-4241

AMERICAN CIVIL LIBERTIES
UNION OF VIRGINIA, INCORPORATED,

*Amicus Supporting Appellee.*

UNITED STATES OF AMERICA,

　　　　　　　*Plaintiff - Appellee,*

　　　　　　　v.

WILLIAM A. WHITE,

　　　　　　　*Defendant-Appellant,*

　　　　　　　v.

UNIVERSITY OF DELAWARE; SOUTH HARRISON TOWNSHIP ( NJ ) POLICE DEPARTMENT,

　　　　　　　*Movants.*

AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA, INCORPORATED,

　　　*Amicus Supporting Appellant.*

No. 10-4452

UNITED STATES OF AMERICA,

        *Plaintiff-Appellant,*

        v.

WILLIAM A. WHITE,

        *Defendant-Appellee,*

        v.

UNIVERSITY OF DELAWARE; SOUTH HARRISON TOWNSHIP ( NJ) POLICE DEPARTMENT,

        *Movants.*

No. 10-4597

AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA, INCORPORATED,

        *Amicus Supporting Appellee.*

Appeals from the United States District Court
for the Western District of Virginia, at Roanoke.
James C. Turk, Senior District Judge.
(7:08-cr-00054-JCT-1)

Argued: October 28, 2011

Decided: March 1, 2012

Before NIEMEYER, DUNCAN, and FLOYD,
Circuit Judges.

Conviction affirmed, sentence vacated, and case remanded for resentencing by published opinion. Judge Niemeyer wrote the opinion for the court, in which Judge Duncan joined and

Judge Floyd joined in part. Judge Duncan wrote a separate concurring opinion. Judge Floyd wrote a separate opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** Linda F. Thome, UNITED STATES DEPART-MENT OF JUSTICE, Washington, D.C., for the United States. Melissa Warner Scoggins, WARREN & ASSO-CIATES, PLC, Norfolk, Virginia, for William A. White. **ON BRIEF:** Thomas E. Perez, Assistant Attorney General, Jessica Dunsay Silver, Tovah R. Calderon, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for the United States. Rebecca K. Glenberg, Gabriel Z. Walters, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA FOUNDATION, INC., Richmond, Virginia, for Amicus Supporting William A. White.

---

## OPINION

NIEMEYER, Circuit Judge:

A jury convicted William White, the "Commander" of the American National Socialist Workers' Party, on four counts (of a seven-count indictment), Counts 1, 3, 5, and 6. The convictions on Counts 1, 5, and 6 were for transmitting in interstate commerce — by email, U.S. Mail, and telephone — threats to injure or intimidate individuals, in violation of 18 U.S.C. § 875(c) (prohibiting interstate communications containing threats to injure a person), and the conviction on Count 3 was for violating 18 U.S.C. § 1512(b)(1) (prohibiting the intimidation of individuals to "influence, delay, or prevent the[ir] testimony").

On White's Rule 29 motion for judgment of acquittal, based on arguments that his communications were political

speech protected by the First Amendment and, in any event, the evidence was insufficient to support a finding of guilt, the district court denied the motion as to Counts 1, 3, and 5 and granted it as to Count 6. The court sentenced White to 30 months' imprisonment, rejecting the government's argument for a sentencing enhancement because of the vulnerability of some victims of the crime charged in Count 3.

The government appealed the district court's judgment of acquittal on Count 6 and its refusal to apply the sentencing enhancement for vulnerable victims on Count 3, and White appealed the district court's refusal to grant his Rule 29 motion as to Counts 1, 3, and 5 and to sustain his objection to Count 3 based on constructive amendment of the indictment.

For the reasons that follow, we affirm the district court's rulings on the Rule 29 motions as to all four counts, and we affirm White's convictions on Counts 1, 3, and 5, but we vacate White's sentence and remand for resentencing because the district court applied an incorrect standard in deciding whether to consider an enhancement for victims' vulnerability.

## I

William White, the "Commander" of the American National Socialist Workers' Party, which he formed in 2006, conducted activities from his home in Roanoke, Virginia, promoting his neo-Nazi white supremacist views by publishing a white supremacist monthly magazine; by posting articles and comments on his white supremacist website, "Overthrow.com," as well as on other similar websites, such as Vanguard News Network Forum; and by conducting a radio talk show.

Following his seven-count indictment for threatening individuals and intimidating them, a jury convicted White on four

counts and acquitted him on three. The facts proved at trial on the four counts of conviction are as follows:

*Count 1: Citibank employee Jennifer Petsche*

Following a dispute with Citibank (South Dakota), N.A., over the amount White owed Citibank and how the bank was reporting White's past due amounts to credit agencies, the bank and White reached a settlement agreement by which White agreed to pay the bank $14,000 and the bank agreed to request deletion of adverse credit commentary as reported by the three primary credit reporting agencies.

When, after a couple of weeks, the adverse commentary, referred to as "derogatories," had not yet been removed, White began calling Citibank repeatedly. He placed approximately 50 calls to Citibank over the period of 24 hours, and eventually left a voicemail for Jennifer Petsche, a litigation specialist at Citibank. In the voicemail, White demanded that Petsche fax to his attorney a copy of the letter that Citibank had sent the credit reporting agencies and said, "I now have your name and direct number so I will not hesitate to call you back should we not receive that in a prompt manner." Petsche's supervisor advised Petsche not to respond to the voicemail since both the company and White were represented by counsel.

The next evening, on March 22, 2007, Petsche received another voicemail from White on her home answering machine, informing her that White had sent her an email and instructing her to "review it, respond to it, and send over the necessary information as quickly as possible." This telephone call frightened Petsche, as she had never before had a customer call her at her home, and she called her husband to determine what time he was coming home. She also called the night supervisor at Citibank to report the call.

The next morning, Petsche found the email sent to several versions of her email address. The email began by listing

Petsche's full name, age, birth date, current home address with the word "confirmed" beside it, three of her previous home addresses, her current home telephone number with the word "connected" beside it, and her husband's full name. The email then read:

> I understand you think you're very tough and you think that by dragging this process out you have created me a lot of misery; that is an incorrect assessment, but I must admit I have run out of patience with you and your smug attitude. I hope the fact that I've obviously paid someone to find you conveys the seriousness with which I take your current attitude.
>
> If you resolve this issue quickly and efficiently I can guarantee you will not hear from me again; if you don't, well, you will be well known to the Citibank customers you are currently in litigation with in [a] very short amount of time.
>
> Again, make my life easy, fax over the letter, and you will not be hearing from me again.
>
> PS: I took the liberty of buying the [Citicard] corporate phone directory and locating information on your outstanding disputed credit accounts from an internet dealer today, and can probably make you better known to your customers than the security measures you enact at your company indicate you would like. Consider this, as I'm sure, being in the collections business and having the attitude about it that you do, that you often make people upset. Lord knows that drawing too much publicity and making people upset is what did in Joan Lefkow.

After the last paragraph, the email included a hyperlink to a Google search on Joan Lefkow. Petsche clicked the hyperlink and learned that Lefkow was a judge whose husband and

mother had been murdered by a disgruntled litigant who had appeared before Judge Lefkow in court.

Petsche took this email "as a direct threat" to herself and her family, and she immediately notified her direct supervisor, the paralegal working with her, and Citibank security. Petsche "went to pieces" and felt as if she was "in a state of shock." The paralegal broke out in hives and had to go home. Citibank's lead investigator took the email as a threat to Petsche and launched a full investigation. Eventually, when he discovered that White was the leader of a white supremacist organization, he turned the investigation over to the FBI, fearing a violent attack on Citibank employees. Petsche testified at trial that she remained in fear for her safety and the safety of her family for the next three years, taking precautions such as changing her telephone number to an unlisted number.

*Count 3: The HUD plaintiffs*

In 2007, African-American tenants of a Virginia Beach, Virginia, apartment complex were pursuing a claim of racial housing discrimination against their landlord through the U.S. Department of Housing and Urban Development ("HUD"). The claim had been reported in the media, and the formal complaint, which included the names of the plaintiffs, was available on HUD's website.

In May 2007, White mailed packages to numerous tenants involved in bringing the complaint, most of which were addressed to adult tenants or simply to "Resident." One package, however, was sent to the address of Tasha Reddick and was addressed to Reddick's two minor children, who were both under the age of nine.

Each of the packages sent to the African-American tenants at the apartment complex included a letter and a copy of a White's neo-Nazi magazine. The letter, which was printed with a letterhead containing a swastika, was addressed to

"Whiney Section 8 Nigger" and included the subject line "Re: Your complaint against Henry LLC." The letter read:

> Dear Nigger Tenant:
>
> I read today of your complaint against James Crocket Henry and Henry LLC. I do not know Mr[.] Henry, but I do know your type of slum nigger, and I wanted you to know that your actions have not been missed by the white community.
>
> For too long, niggers like you have been allowed to get one over on the white man. You won't work. You won't produce. You breed and eat and turn the world around you into a filthy hole, but you won't do anything to earn or deserve the life you live. Niggers like you are nothing new. All of Africa behaves as you do - with the difference that, there, there is no white man to exploit, only brutal niggers [sic] dictators to give the lot of you the kind of government you deserve.
>
> You may get one over on your landlord this time, and you may not. But know that the white community has noticed you, and we know that you are and will never be anything other than a dirty parasite - and that our patience with you and the government that coddles you runs thin.

White signed each letter, "Bill White, Commander, American National Socialist Workers' Party." The enclosed magazine displayed a large swastika on the cover with the word "The Negro Beast" emblazoned on the front.

Two of the tenants, Tiese Mitchell and Reddick, testified at trial that they were frightened by the letter and immediately packed up their belongings to take their children to stay with relatives for several days. They understood the letter to mean

that they should stop pursuing their lawsuit and that, if they did not, they would be in danger of harm.

About two weeks after mailing these letters, White bragged on his radio show that he had given the plaintiffs in the HUD lawsuit "a little bit of spooking with the haints." He explained that the Klansmen after the Civil War would appear in robes to make African-Americans believe they were being pursued by the ghosts of Confederate soldiers so that, as White put it, "the niggers got so terrified that they wouldn't vote, they wouldn't do anything." Referencing the mailing to the HUD plaintiffs, White continued, "that's kind of what we've done here."

*Count 5: University of Delaware administrator Kathleen Kerr*

In the fall of 2007, the University of Delaware initiated a new "diversity training program" that attracted the attention of the national media and also White. Kathleen Kerr, who was the Director of Residential Life and played a major role in the new program, was in a meeting when her assistant, Carol Bedgar, received a telephone call for Kerr. The caller identified himself as "Commander Bill White of the American White Workers' Party." The caller asked to speak with Kerr, and, after Bedgar informed him that Kerr was not in the office, the caller said that he knew that she was there because he had just spoken to her husband Chris. The caller then recited Kerr's home telephone number and a residential address that Bedgar recognized as the address of Kerr's father in New Jersey. When Bedgar asked if she could take a message, the caller replied, "Yes. Just tell her that people that think the way she thinks, we hunt down and shoot." According to Bedgar, the caller delivered this message in a "cold" and "dead sounding" tone of voice. Bedgar later testified that after receiving the call, she sensed "evil" and began to pray for safety. When advised of the call, Kerr broke down and began to cry out of concern for her family and her family's safety.

(At trial, White disputed that he had been the caller. The caller, however, identified himself to Bedgar as "Bill White," and telephone records showed that a telephone call had been placed on that day from White's home to Kerr's office.)

Bedgar, Kerr, and the staff of the University of Delaware took the call as a very serious threat and called the police. Kerr and University officials were also alerted to White's website, "Overthrow.com," which has a post entitled "University of Delaware's Marxist Thought Reform." The website listed Kerr's full name, email address, date of birth, home telephone number listed as "confirmed," and father's address in New Jersey mistakenly calling it her husband's address. The website also listed the University President's full name, email address, date of birth, spouse's name, spouse's date of birth, home address, vacation home address, and telephone numbers. The website instructed readers to "go to their homes," and beneath Kerr's information were the words, "We shot Marxists sixty years ago, we can shoot them again!" The University's Chief of Police also located another web entry entitled "Smash the University of Delaware," which included the personal information of Kerr and the University President with the instruction, "You know what to do. Get to work!"

As a result of this telephone call and the website postings, University of Delaware President Harker convened an emergency meeting of the top administrators and law enforcement officials at the University to discuss appropriate security measures in response to the threats. The FBI, local law enforcement officers, and University police took the telephone call as a serious threat, and law enforcement officers guarded Kerr and her family at work and home for the next several days. Kerr and her husband would not let their children play outside for several weeks for fear of their safety, and Kerr's father was advised by police not to leave his house for several days, to secure all doors, to cover all windows, and to cancel his plans to participate in a community event.

*Count 6: Richard Warman*

Richard Warman is a Canadian civil rights lawyer who actively fights "hate speech" in Canada and specifically targets white supremacist movements. He often brings cases against neo-Nazi groups and their websites before the Canada Human Rights Tribunal, which awards a "bounty" to individuals who successfully bring such suits even if they were not victims of the hate speech.

In July 2006, White sent a personal email to Warman, lamenting the fact that the website of Alex Linder, a well-known white supremacist, had been shut down by the Canadian government and stating that Linder was "correct when he says the assassination of Canadian Jews and the officials who bow to them would be an act of patriotism." According to Warman, this email marked the beginning of a "campaign of terror" that lasted for two years, during which White repeatedly referred to Warman as a "Jew" and advocated violence towards him, even championing his murder.

The only other direct contact made by White to Warman occurred in October 2006 when White mailed a package to Warman's home address. The package contained one of White's magazines, which had a picture of Warman on the back cover with the caption, "Yeah, We Beat This Prick." Beneath the caption, Warman's home address was printed with the words, "Tired of the Jews taking away your rights?"

Several months later in February 2007, White published a "work of fiction" on his website entitled "The Death of Robert Waxman in the Not Too Distant Future," the original title of which had been "The Death of Robert *Warman* . . . ." A disclaimer to this fictional story by White noted that "since it is illegal to publish material like this in Canada, we are publishing it here as a favor to our Canadian allies. May we all pray that this work becomes something more [than] mere fiction." The story described real cases in which Warman had been

involved and featured a protagonist smiling as he placed a shotgun in Waxman's mouth and pulled the trigger.

White continued to post comments about Warman throughout the rest of 2007, repeatedly calling for his assassination and posting his home address. None of the communications during 2007, however, formed the basis for Count 6. The government introduced these pre-2008 communications only for context. There were two communications that followed in 2008, however, which did form the basis for Count 6.

In the first, in February 2008, White posted on the Vanguard News Network, a white supremacist website run by Alex Linder, an article describing the firebombing of a Canadian civil rights activist's house by a neo-Nazi group and wrote underneath the link, "Good. Now someone do it to Warman." In the second, in March 2008, White posted an entry on his own website entitled "Kill Richard Warman, man behind human rights tribunal's abuses should be executed." The post began:

> Richard Warman, the sometimes Jewish, sometimes not, attorney behind the abuses of Canada's Human Rights Tribunal should be drug [sic] out into the street and shot, after appropriate trial by a revolutionary tribunal of Canada's white activists. It won't be hard to do, he can be found easily at his home, at [Warman's home address].

The post described Warman's use of Canada's hate speech laws against white supremacists and compared White's calls for the execution of Warman to the advocacy of other U.S. citizens for the death of Osama Bin Laden. The post closed with an "irreconcilable fact: Richard Warman is an enemy, not just of the white race, but of all humanity, and he must be killed. Find him at home and let him know you agree: [Warman's home address]."

In May, White reiterated this call, posting a blog entry entitled "Kill Richard Warman" that included Warman's home address and the statement: "I do everything I can to make sure everyone knows where to find this scum, particularly because it makes him so mad: Kill Richard Warman! [Warman's home address]." This May 2008 communication also was not a basis for Count 6, but was offered only for context.

Warman read these internet postings and, as he testified, considered them to be "death threats." He took numerous steps to ensure his safety and his family's safety. He moved to a new home, which he and his wife put in her maiden name to hide it from the defendant; he removed all of his contact information from public databases; he altered his personal routine and stopped meeting his wife for lunch near her office; he started receiving his mail at a post office box; he had his wife register as a single mother when she gave birth to their daughter; and he and his wife decided not to give his daughter the Warman surname in order to protect her.

## II

The jury convicted White on Counts 1, 5, and 6 for violations of 18 U.S.C. § 875(c), which criminalizes the interstate transmission of "any threat to injure the person of another." White filed a motion under Rule 29 for a judgment of acquittal on these counts, arguing that his "threats" were political hyperbole, and even though they were rude, they were protected by the First Amendment. Accordingly, they were not "true threats" that could be punished under § 875(c). *See Watts v. United States*, 394 U.S. 705 (1969).

The district court denied White's Rule 29 motion as to Counts 1 and 5, concluding that the government's evidence was more than sufficient for a rational trier of fact to find, beyond a reasonable doubt, the essential elements of the crimes charged. In reaching this conclusion, the court construed § 875(c) to require a showing that the defendant specif-

ically intended *to communicate* a threat and not that the defendant specifically intended *to threaten* the victims. The court held that whether the communication contained a threat did not depend on White's subjective intent but had to be determined by "the interpretation of a reasonable recipient familiar with the context of the communication." (Quoting *United States v. Darby*, 37 F.3d 1059, 1066 (4th Cir. 1994)). While the district court recognized that the Supreme Court's decision in *Virginia v. Black*, 538 U.S. 343 (2003), which was handed down after *Darby*, had been construed by at least one court to require the showing of *a specific, subjective intent to threaten*, leading to some confusion as to whether this court's holding in *Darby* remained good law, the court did not read *Black* to require that showing, holding that "*Black* did not effect a change in the law with regards to threats under 18 U.S.C. § 875(c) and that the reasonable recipient test as set forth in *Darby* should continue to apply."

As to Count 6, the court granted White's motion for judgment of acquittal, concluding that, viewing the evidence in the light most favorable to the prosecution, no rational finder of fact could have found that *a reasonable recipient* of the communications charged in Count 6, familiar with its context, would have considered the communication "to be a serious expression of an intent to commit an act of unlawful violence" and therefore a "true threat," as required for a violation of § 875(c). (Quoting *Black*, 538 U.S. at 359).

White appealed the district court's order denying his Rule 29 motion for judgment of acquittal on Counts 1 and 5, and the government appealed the district court's judgment granting White's motion for judgment of acquittal on Count 6. Both appeals raise the same question of whether White communicated "true threats" to injure an individual, in violation of § 875(c).[1]

---

[1]In a footnote to his brief on appeal, White also incorporates summarily the arguments made by the ACLU's amicus brief, where the ACLU chal-

In criminalizing the interstate transmission of any "communication" containing a threat to injure, 18 U.S.C. § 875(c) criminalizes pure speech. Accordingly, such a provision must be interpreted "with the commands of the First Amendment clearly in mind." *Watts*, 394 U.S. at 707.

But even though the First Amendment protects speech broadly, it does not prohibit the criminalization of a "true threat" to injure a person. *Id.* True threats, like "fighting words," *see Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942), are words that "by their very utterance inflict injury," and the "prevention and punishment" of such threatening speech "has never been thought to raise any Constitutional problem." *Id.* at 571-72. "[P]rotecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur" are fundamental concerns about the security and safety of individual citizens that place "threats of violence . . . outside the First Amendment." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992). Because true threats have the potential to cause such harm and imperil the security of individual citizens, the punishment of these threats "has traditionally coexisted comfortably with even a strong First Amendment." *See* Fredrick Schauer, *Intentions, Conventions, and the First Amendment: The Case of Cross-Burning*, 2003 Sup. Ct. Rev. 197, 211 (2003).

Thus, both White and the government agree that § 875(c) can only be violated if the interstate communication contains a "true threat" to injure a person. *See United States v. Bly*, 510 F.3d 453, 458-59 (4th Cir. 2007).

---

lenged the district court's jury instructions on § 875(c) for not requiring that the jury find specific intent. While we are not sure that White preserved a challenge to the district court's instructions with respect to § 875(c), we would reach the same result on that issue as we do in reviewing the district court's order denying White's Rule 29 motion.

In determining whether a statement is a "true threat," we have employed an objective test so that we will find a statement to constitute a "true threat" "if 'an ordinary reasonable recipient who is familiar with the context . . . would interpret [the statement] as a threat of injury.'" *United States v. Armel*, 585 F.3d 182, 185 (4th Cir. 2009) (quoting *United States v. Roberts*, 915 F.2d 889, 891 (4th Cir. 1990)); *Darby*, 37 F.3d at 1066. The district court applied this objective test in denying White's Rule 29 motion on counts 1 and 5.

White contends that the district court erred because the Supreme Court's description of a true threat in *Black* altered, or even overruled, the objective standard that we have applied. In *Black* the Court stated that "'true threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." 538 U.S. at 359. White argues that, based on this statement, we should now hold "that Section 875(c) requires proof of *specific intent to threaten*," as did the Ninth Circuit in *United States v. Cassel*, 408 F.3d 622 (9th Cir. 2005), where the court interpreted *Black* to require a subjective showing that the speaker specifically intend that the recipient of the threat feel threatened.

We are not convinced that *Black* effected the change that White claims. A careful reading of the requirements of § 875(c), together with the definition from *Black*, does not, in our opinion, lead to the conclusion that *Black* introduced a specific-intent-to-threaten requirement into § 875(c) and thus overruled our circuit's jurisprudence, as well as the jurisprudence of most other circuits, which find § 875(c) to be a general intent crime and therefore require application of an objective test in determining whether a true threat was transmitted.

Section 875(c) in essence makes it a crime to "*transmit any communication* containing [a] threat to injure." (Emphasis

added). The physical act of the crime — the *actus reus* — is the transmission of a communication, and the criminal intent — the *mens rea* — is not explicitly specified. In *Darby*, we applied general *mens rea* principles and rejected the defendant's contention that § 875(c) requires a showing of specific intent that the recipient feel threatened. We held instead that, in the absence of specific statutory language to the contrary, § 875(c) is presumed to be a *general intent* crime. *Darby*, 37 F.3d at 1066. Of course, a general intent crime does not require that the defendant intend the precise purpose or results of the crime but only that the defendant intentionally engage in the *actus reus* of the crime, in this case the transmission of a communication. *See Carter v. United States*, 530 U.S. 255, 268 (2000). Thus, under *Darby*, the government need not prove that a defendant transmitted the communication with the *specific intent that the defendant feel threatened* but only with the *general intent* to transmit the communication. And because the threat element is not part of the *mens rea*, it becomes an element of the crime that must be established without consideration of the defendant's intent. Accordingly, when determining whether the element of a true threat is established, we look objectively to "the interpretation of a reasonable recipient familiar with the context of the communication." *Darby*, 37 F.3d at 1066.

The statement in *Black* relied on by White is entirely consistent with *Darby*. The Supreme Court in *Black*, which was not focusing on § 875(c) but rather on a Virginia statute making it a crime to burn a cross with the intent of intimidating a person, stated that "true threats" "encompass those statements where the speaker *means to communicate* a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359 (emphasis added). We read the Court's use of the word "means" in "means to communicate" to suggest "*intends* to communicate," so that the speaker must *intend* to communicate a threat, the general intent standard we applied in *Darby*. The "threat," which is the object of the communica-

tion, is then defined to be the "serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," which is simply the Court's definition of a threat that falls outside of First Amendment protection. But in defining a true threat, the Court gave no indication it was redefining a general intent crime such as § 875(c) to be a specific intent crime. It was defining the necessary *elements* of a threat crime in the context of a criminal statute punishing intimidation. Moreover, the Court goes on to imply the application of an objective test for finding a true threat by focusing on the *effect* of the threat on the recipient. The Court stated: "A prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Id.* at 360 (internal quotation marks and alterations omitted).

With this understanding of what *Black* stated, we find the Court's statement entirely consistent with our holding in *Darby*. And so did the district court when it rejected White's argument that *Black* introduced a subjective intent requirement into § 875(c). The district court stated:

> A reading of *Black* that transforms "means to communicate" into "subjectively intended to threaten" would require "communicate" to carry much more weight than can reasonably be accorded to the basic understanding of "communicate." It is a much more reasonable conclusion that "means to communicate" simply reiterates the requirement set forth in *Darby* that "the defendant intended to transmit the interstate communication." And, moreover, there is nothing in the *Black* opinion to indicate that the Supreme Court intended to overrule a majority of the circuits by adopting a subjective test when dealing with true threats.

Our conclusion does not yield to White's expressed fears about an unwitting regulation of wayward statements of jest

or political hyperbole. This is so because any such statements will, under the objective test, always be protected by the consideration of the context and of how a reasonable recipient would understand the statement. Thus, while the speaker need only *intend to communicate* a statement, whether the statement amounts to a true threat is determined by the understanding of a *reasonable recipient familiar with the context* that the statement is a "serious expression of an intent to do harm" to the recipient. *Black*, 538 U.S. at 359. This is and has been the law of this circuit, and nothing in *Black* appears to be in tension with it.

In reaching this conclusion, we remain consistent with our recent precedent in *Armel*, 585 F.3d at 185, where we also applied the reasonable recipient test, even after *Black*, to define a true threat. *See also Bly*, 510 F.3d at 457-59; *United States v. Lockhart*, 382 F.3d 447, 451-53 (4th Cir. 2004); *United States v. McDonald*, 444 F. App'x 710, 712 (4th Cir. 2011) (finding issue of whether § 875(C) requires specific intent in light of *Black* settled in this circuit); *United States v. Corbett*, 374 F. App'x 372, 380-81 (4th Cir. 2010). Indeed, these precedents are binding and prohibit us from adopting White's argument, were we inclined to do so. *See Etheridge v. Norfolk & Western Ry.*, 9 F.3d 1087, 1090 (4th Cir. 1993).

Most other circuits also continue to apply an objective test after *Black*, even though some courts focus on a "reasonable sender" of the communication or simply a "reasonable person" familiar with all the circumstances. *See United States v. Koski*, 424 F.3d 812, 818-20 (8th Cir. 2005) (applying a "reasonable recipient" test); *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 616 & n.26 (5th Cir. 2004) (applying an "objectively reasonable person" test); *United States v. Fuller*, 387 F.3d 643, 646 (7th Cir. 2004) (looking at how a "reasonable person would foresee that the statement would be interpreted"); *United States v. Zavrel*, 384 F.3d 130, 135-36 (3d Cir. 2004) (judging the speech from the standard of a "reasonable person hearing . . . or receiving the communication");

*United States v. Alaboud*, 347 F.3d 1293, 1297-98 & n.3 (11th Cir. 2003) (concluding that both a "reasonable listener" and a "reasonable speaker" test amount to the same "reasonable person" test); *United States v. Nishniandize*, 342 F.3d 6, 15 (1st Cir. 2003) (applying a "reasonable recipient" test).

Only the Ninth Circuit's decision in *Cassel*, 408 F.3d at 631-32, seems to have adopted a distinct subjective test in light of *Black*, holding that after *Black* a subjective intent to threaten is a necessary part of the definition of a true threat. But even *Cassel* stands in doubt, as a later Ninth Circuit opinion applied the objective test. *See United States v. Romo*, 413 F.3d 1044 (9th Cir. 2005). Moreover, subsequent Ninth Circuit opinions have recognized the inconsistency between *Cassel* and *Romo*. *See Fogel v. Collins*, 531 F.3d 824, 831 (9th Cir. 2008); *United States v. Stewart*, 420 F.3d 1007, 1017-18 (9th Cir. 2005). Most recently, the Ninth Circuit now appears to be retreating from *Romo*. *See United States v. Bogdasarian*, 652 F.3d 1113, 1117 & n.14 (9th Cir. 2011).

The dissent, relying almost wholly on the Ninth Circuit's opinion in *Cassel* and a student law review note, contends that *Black* does indeed impose a specific intent requirement on § 875(c). The dissent argues that because "a majority of the Justices [in *Black*] viewed proof of an intent to intimidate as constitutionally necessary to convict an individual of cross burning without violating the First Amendment," § 875(c) must have a specific intent requirement. *Post* at 42. The dissent, however, takes the *Black* Court's observations out of the context of the Virginia statute that was before it. When the Court's discussion is given context, it is clear that the discussion that the dissent is referring to was not addressing any requirement of a specific intent *mens rea* for true threats, but rather a specific intent *element* that existed in the Virginia statute, as well as the aspect of the statute that presumed the element to be satisfied by simply proving that a cross had been burned.

The Virginia statute at issue in *Black* punished the burning of a cross "with the intent of intimidating any person," and provided that "such burning of a cross shall be *prima facie* evidence of an intent to intimidate a person." *Black*, 538 U.S. at 348 (quoting Va. Code Ann. § 18.2-423 (1996)). Recognizing that simply burning a cross *without* the intimidation element could not be criminalized, *id.* at 365, the *Black* Court, through various opinions, addressed how the intimidation element could be satisfied. At bottom, however, eight Justices recognized that the intimidation element was necessary to render the cross burning statute constitutional.

Section 875(c), however, addresses actual threats and not cross burning, and while cross burning would need an element of intimidation to be even considered a true threat, a true threat to injure a person can be criminalized without more. The dissent's efforts to apply *Black*'s statements about the need to establish the intimidation element in the cross burning statute to a statute criminalizing true threats are simply based on a misunderstanding of the discussion in *Black* and the subject it addressed. While the *Black* discussion was indeed concerned with the fact that criminalizing cross burning without proof of *any* intent to intimidate would be unconstitutional, the Court did not engage in any discussion that proving true threats as used in § 875(c) or in similar statutes required a subjective, rather than objective, analysis. *See United States v. Mabie*, 663 F.3d 322, 332 (8th Cir. 2011) ("Notably, the *Black* Court did not hold that the speaker's subjective intent to intimidate or threaten is required in order for a communication to constitute a true threat. Rather, the Court determined that the statute at issue in *Black* was unconstitutional because the intent element that was included in the statute was effectively eliminated by the statute's provision rendering any burning of a cross on the property of another *prima facie* evidence of an intent to intimidate").

In short, cross burning can be protected speech, and therefore it must be accompanied by an intent to intimidate to be

the subject of a constitutionally acceptable criminal statute. A true threat to injure a person, however, standing alone, is not protected speech and can be the subject of a constitutionally acceptable criminal statute that requires only a general intent *mens rea*.

Also, in its arguments to find a specific intent requirement in § 875(c), the dissent fails to recognize that First Amendment principles distinguish protected speech from unprotected speech based on an *objective* view of the speech, not its *mens rea*. *See FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 468 (2007) ("[U]nder well-accepted First Amendment doctrine, a speaker's motivation is entirely irrelevant to the question of constitutional protection" (quoting Martin H. Redish, *Money Talks: Speech, Economic Power, and the Values of Democracy* 91 (2001)). Failing to recognize this clear language of the Supreme Court to the contrary, the dissent argues that "imposing such a specific-intent-to-threaten requirement . . . has a sound basis in First Amendment jurisprudence," *post* at 47, citing in support the actual malice standard for the defamation of public officials set forth in *New York Times v. Sullivan*, 376 U.S. 254 (1964) and the test for advocacy for unlawful conduct set forth in *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam). From these decisions, the dissent concludes that "[t]he First Amendment, therefore, imposes heightened, subjective *mens rea* requirements in certain contexts." *Post* at 48. These cases, however, do not support the dissent's argument.

The "actual malice" standard in *New York Times* only requires "knowledge" of a statement's falsity or a "reckless disregard" for the truth and in no way requires that the speaker have a specific intent to harm the reputation of an individual with his speech. *New York Times*, 376 U.S. at 254; *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) ("Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will"). Simi-

larly, the *Brandenburg* test only requires that the speaker use specific words advocating unlawful conduct. It does not require that the speaker have a specific intent to incite unlawful conduct. *See Schauer*, *supra*, at 220 ("*Brandenburg* may be best interpreted as not incorporating a distinct First Amendment-rooted intent requirement, although of course it will usually be the case that a person intends the ordinary meaning and natural consequences of the words he uses"). Indeed, the Supreme Court has made clear that the *Brandenburg* test should be evaluated using the *objective* facts surrounding the speech and should not be focused on a speaker's subjective purpose for speaking. *See Brandenburg*, 395 U.S. at 447 (reviewing the objective circumstances of the rally and the speeches); *see also Texas v. Johnson*, 491 U.S. 397, 409 (1989) ("[W]e have . . . required careful consideration of the actual circumstances surrounding such expression, asking whether the expression 'is directed to inciting or producing imminent lawless action and is likely to incite or produce such action'"); *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 927-29 (1982) (evaluating how the words of the speaker "might have been understood" in looking to the objective circumstances "whether or not proper discipline was specifically intended").

For these reasons, we find unpersuasive the dissent's argument to read *Black* as changing the *mens rea* requirements applying to § 875(c). Every court of appeals (except the Ninth Circuit) has applied and continues to apply § 875(c) with an objective standard for determining whether the object of a communication was a true threat.

Accordingly, we affirm the district court's interpretation of § 875(c) in denying White's Rule 29 motion.

## III

The question of whether White's communications to Petsche, Kerr, and Warman were true threats, as defined in *Darby*

and *Black*, is a jury question. *United States v. Roberts*, 915 F.2d 889, 891 (4th Cir. 1990). Thus, we determine whether, viewing the evidence in the light most favorable to the government, there was sufficient evidence "to decide that a reasonable recipient would interpret [White's communication] as a threat." *United States v. Floyd*, 458 F.3d 844, 849 (8th Cir 2006).

*Count 1: Petsche*

With respect to Count 1, the government demonstrated that White had paid money to locate a large amount of personal information about Petsche, and White so advised Petsche. White, expressing frustration in his relations with Citibank, specifically threatened in an email that White would act if Petsche did not respond quickly, concluding the email by comparing Petsche to Judge Lefkow, whose relatives had been murdered. Any reasonable recipient of this email would have taken it as a threat of violence. *See Floyd*, F.3d at 849 (holding that the anonymous mailing of a newspaper about Judge Lefkow to judicial officers with words "be aware be fair" constituted a true threat). Moreover, Petsche, as well as other Citibank employees, security officers, and law enforcement officers took White's email as a serious threat, providing corroborating evidence of how the threat would be taken by a reasonable person. *See Roberts*, 915 F.2d at 891 (holding the jury's verdict was supported by evidence that "both Justice O'Connor's secretary and the Supreme Court police took the letter quite seriously as did the FBI"). We conclude that the evidence amply supports White's conviction on Count 1.

*Count 5: Kerr*

Again we conclude that the evidence amply supports White's conviction on Count 5. In opposing a diversity training program initiated at the University of Delaware, White called Kerr's office and left a message that people who thought the way that Kerr thought *were hunted down and*

*shot*. The delivery of the message carried a serious tone and was taken seriously. Again Kerr, her husband, the officials at Delaware University, and law enforcement agencies took the call, in the context of White's public opposition to Delaware's program, to be a serious expression of intent to harm Kerr, providing corroborating evidence of how the threat would be taken by a reasonable recipient familiar with the context.

*Count 6: Richard Warman*

White's communications directly and indirectly to Richard Warman were part of a protracted campaign to oppose Warman's work in Canada, fighting neo-Nazi and white supremacy groups. Except for the two communications charged in Count 6, however, these communications were presented only as context, and as context, they were insufficient to elevate the communications in Count 6 to true threats.

The first of the two communications forming the basis for the conviction on Count 6 was a February 8 posting on a website that referenced the recent firebombing of a Canadian civil rights activist's house with the subscript, "Good. Now someone do it to Warman." The second, in March 2008, was again a posting on White's website indicating that Warman "should be drug [sic] out into the street and shot." It also asserted that "Richard Warman is an enemy, not just to the white race but of all humanity and he must be killed." These communications clearly called for someone to kill Richard Warman. But neither communication actually provided a threat from White that expressed an intent to kill Warman. While a direct threat of that type would not always be necessary, for White to have called on others to kill Warman when the others were not even part of White's organization, amounted more to political hyperbole of the type addressed in *Watts* than to a true threat. Moreover, the two communications forming the basis for Count 6 were posted to neo-Nazi websites and not sent directly to Warman.

While a direction to others to kill Warman could have amounted to a threat if White had some control over those other persons or if White's violent commands in the past had predictably been carried out, none of that context exists in this case. In short, the communications that formed the basis of Count 6 were expressions not directed to Warman but to the public generally and did not communicate an intent to take any action whatsoever. In these circumstances, we agree with the district court that the communications fell short of being true threats.

The government argues that a communication does not have to be given or sent directly to the threatened individual to be a true threat, citing to *United States v. Lockhart*, 382 F.3d 447 (4th Cir. 2004), where we upheld a conviction under a different threat statute after the defendant delivered a letter to a grocery store threatening to kill the President. *See also Floyd*, 458 F.3d at 849; *United States v. Dinwiddie*, 76 F.3d 913, 925-26 & n.9 (8th Cir. 1996). While the government is correct in noting that neither direct communication nor personal or group involvement in the threat is an essential component to finding a true threat, the lack of both, along with the fact that White's language was clearly directed to others in the form of advocacy, makes it impossible for us to conclude that a reasonable recipient would understand White's communications to be *serious expressions of intent to commit harm.*

The government argues further that the context in which White's statements were made elevates the statements and makes up for the lack of a direct threat to commit harm. It points to White's earlier references to actual violence, such as firebombing of an activist's house, and the violent edge that accompanied all of White's statements. The government argues that these public statements were made relevant to Warman and were specifically designed to threaten Warman. But even taking into account the context created by these earlier communications, we cannot conclude that a reasonable

recipient would believe that White's two communications advocating violence to Warman expressed an intent to harm Warman. The principal message expressed in White's communications was that *someone else* should kill Warman.

While the two communications for which White was indicted, along with the context surrounding them, may have undoubtedly frightened Warman, those communications at most conveyed a *serious desire* that Warman be harmed by others but did not convey a *serious expression of intent* to do harm from the perspective of a reasonable recipient. Accordingly, we affirm the district court's judgment of acquittal on Count 6.[2]

IV

White contends that the district court erred also in denying his Rule 29 motion for judgment of acquittal on Count 3, where he is charged with intimidation to influence, delay, and prevent the testimony of African-American tenants in Virginia Beach against their landlord by mailing intimidating letters to the tenants, in violation of 18 U.S.C. § 1512(b)(1). White argues that in order for § 1512 to be applied constitutionally, the evidence of intimidation must rise to the level of a "true threat" and that the evidence in this case did not support proof of a true threat. As he claims:

Section 1512(b)(1) requires proof of "intimidation,"

---

[2]With respect to Count 6, White also contends that the indictment varied materially from the communication relied on to prove guilt. The indictment referred to a communication sent "on or about February 26, 2008," whereas the only communication proved was a communication dated March 26, 2008. The government admits that the indictment contained an error stating February instead of March, but it pointed out the error before trial, and both parties conducted the trial with the understanding that the March 26 communication was the basis of the charge. We need not, however, resolve this question in view of the fact that we are affirming the district court's judgment of acquittal on Count 6.

which the Supreme Court has held to mean, in the constitutionally proscribable sense, "a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death."

(Quoting *Black*, 538 U.S. at 344). He asserts that because the letters did not put the recipients in fear of bodily harm, a violation of § 1512 was not established.

White's reference to *Black* is, however, inapt. The Court in *Black* was addressing a Virginia cross-burning statute that prohibited substantively *the conduct of intimidation* in the form of cross-burning. The object of § 1512(b), however, is *to protect testimony* in an official proceeding by prohibiting intimidation undertaken "to influence, delay, or prevent the testimony." 18 U.S.C. § 1512(b)(1). "[S]peech is not protected by the First Amendment when it is the very vehicle of the crime itself." *United States v. Varani*, 435 F.2d 758, 762 (6th Cir. 1970) (citing bribery, perjury, and threats as examples).

In this case the jury found that the defendant knowingly used intimidation, in the form of the letters, with the intent to affect the tenants' prosecution of their lawsuit alleging racial discrimination against their landlord. We find no First Amendment problem with such a finding.

Moreover, the evidence readily supports the jury's finding. Accordingly, we affirm the district court's order denying White's Rule 29 motion on Count 3.[3]

---

[3]White also claims that there was a constructive amendment in Count 3 in that the indictment alleged the mailing of "*letters* containing intimidating language" whereas the government introduced not only letters but *magazines* that were included in the packages with the letters. This argument is without merit, however. In setting forth the facts of Count 3, the indictment refers to both the letters and the magazines, charging:

## V

The government has appealed the sentence that the district court imposed on White, contending that the court erred in calculating White's offense level because it applied an out-dated legal standard in denying the government's request for a two-level adjustment based on the victims' vulnerability, as provided in U.S.S.G. § 3A1.1(b)(1). The government objected to the presentence report's rejection of the enhancement and asked the court for the two-level upward adjustment. The government based its request on the facts that White had addressed the packages sent to Reddick's residence to her two minor children and that White was apparently aware that the children were minors because they were so identified in the HUD complaint and the allegations of the complaint referred to the children "playing outside."

The probation officer rejected the government's request for a vulnerable victim adjustment, reasoning:

> In order to apply an enhancement for vulnerable victim the court must make two findings. First, the court must conclude that the victim was unusually vulnerable, and, second, that *the defendant targeted the victim* because of the victim's unusual vulnerability. In most cases, a minor — someone under the age of 18 years, may be considered a vulnerable vic-

On or about May 25, 2007, the African-American Virginia Beach, Virginia, tenants each received William A. White's May 23, 2007 letter in their Virginia Beach, Virginia, home mailboxes. These letters were delivered in envelopes bearing the name and address of each African-American tenant recipient. Included in the envelope was an ANSWP Magazine, emblazoned with a swastika and entitled 'The Negro Beast and Why Blacks Who Work Aren't Worth the Cost of Welfare.' The magazine contains numerous articles espousing extreme white supremacists' viewpoints.

tim, depending on the exact age of the minor and the circumstances of the offense. There is no evidence that White knew the ages of the minor children of Tasha Reddick, whether they were infants or 17 years of age, or somewhere in between, only that they were minors as identified in the suit . . . . However, *the second prong of the test, that the defendant targeted the victim because of the victim's age cannot be met*, even by a preponderance of the evidence. The facts of the case suggest that White targeted the victim, not because of their age, but because of their race and the fact that they were listed as a charging party in the HUD discrimination suit.

(Emphasis added). The district adopted this finding.

Beginning in 1995, however, it became "unnecessary for a sentencing court to find that a defendant had specifically targeted his victim," the second and dispositive factor cited by the presentence report. *United States v. Bolden*, 325 F.3d 471, 500 n.35 (4th Cir. 2003). Under the current test, a court must first "determine that a victim was unusually vulnerable" and, second, "assess whether the defendant knew or should have known of such unusual vulnerability." *United States v. Llamas*, 599 F.3d 381, 388 (4th Cir. 2010). Thus, the district court erred by adopting the outdated "targeting test" applied in the presentence report and made no finding regarding whether White knew or should have known of his victims' vulnerability.

Relevant to the current test, the government did present evidence that White knew or should have known of the vulnerability of the victims of his threat. It submitted evidence that White had read the tenants' HUD complaint, which described how Reddick's children were called "nigger children" by the landlord and three times referenced the fact that Reddick's children "were playing outside," indicating their youth. The government argues that White knew that the children were

minors also because they were classified as such when listed as parties to the complaint. The fact that White might be able to demonstrate that he did not know *the specific ages* of the children would not be dispositive. The relevant question is whether White knew or should have known of the children's vulnerability. While a specific age can be a proxy for such vulnerability, it is not essential. In short, there was evidence in the record that the district court should have considered when applying the correct legal standard.

Accordingly, we vacate White's sentence and remand for resentencing.[4]

* * *

In sum, we affirm White's convictions, vacate his sentence, and remand for resentencing in accordance with this opinion.

*CONVICTION AFFIRMED, SENTENCE VACATED,*
*AND CASE REMANDED FOR RESENTENCING*

DUNCAN, Circuit Judge, concurring:

I am pleased to join the excellent majority opinion in its entirety. I write separately for the purpose of emphasizing a few points I find particularly significant.

I begin with the foundational principle that "a panel of this court cannot overrule, explicitly or implicitly, the precedent set by a prior panel of this court. Only the Supreme Court or this court sitting *en banc* can do that." *Mentavlos v. Anderson*, 249 F.3d 301, 312 n.4 (4th Cir. 2001). Here, the dissent con-

---

[4]The government also alleges that the presentence report incorrectly calculated White's offense level under U.S.S.G. § 3D1.4, finding it to be 16, rather than 17. While our review indicates that the offense level appears to have been improperly calculated, we have not addressed the point in view of our remand. But if the government wishes to reargue this point to the district court on remand, we leave that issue open for that possibility.

tends that *Virginia v. Black*, 538 U.S. 343 (2003), constitutes a "superseding contrary decision" that requires this circuit to reexamine our definition of a "true threat." *Post* at 39. I cannot agree. As I explain below, *Black* is not contrary to, and therefore does not overrule, our prior precedent that directly addresses the issue presented. We do not lightly presume that the law of the circuit has been overturned. *See United States v. Jeffery*, 631 F.3d 669, 676-78 (4th Cir. 2011) (adhering to our precedent when a subsequent Supreme Court decision did not directly overrule it); *United States v. Brooks*, 524 F.3d 549, 559-60 (4th Cir. 2008) (same). Such a presumption would be particularly inappropriate where, as here, the Supreme Court opinion and our precedent can be read harmoniously. Supporting my conclusion that *Black* did not overrule *Darby* is the fact that, in three published opinions issued after *Black*, we have considered whether an appellant's communications were punishable as a true threat without imposing a specific intent requirement. *United States v. Armel*, 585 F.3d 182, 185 (4th Cir. 2009); *United States v. Bly*, 510 F.3d 453, 458-59 (4th Cir. 2007) (quoting *Black*); *United States v. Lockhart*, 382 F.3d 447, 451-52 (4th Cir. 2004). That our court has not modified our general intent standard, despite having had at least three post-*Black* opportunities to consider whether that case required reexamination of our precedent, indicates that *Black* did not overturn *Darby* or its progeny, nor did it create a new standard for true threats to be applied across the board. Therefore, in deciding this case, we are bound by our court's prior holdings.

Even if that were not the case, however, I believe the dissent's understanding of *Black* is demonstrably incorrect. By interpreting *Black* to require a showing that a person specifically intended to threaten a victim in every statute that punishes threatening communications, the dissent overlooks the fact that the Virginia statute at issue in that case explicitly made it unlawful to burn a cross "with the intent of intimidating any person or group of persons." 538 U.S. at 348. Thus, the Supreme Court's statements that "'[t]rue threats' encom-

pass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals" and that "[i]ntimidation . . . is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death" are properly read, in context, to be addressing a *specific intent statute* that requires, as an element of the offense, a specific intent to intimidate. The statute at issue here, 18 U.S.C. § 875(c), includes no such specific intent requirement.

As both the majority and the dissent recognize, most of our sister circuits have continued to analyze true threats as requiring only a showing of a general intent to communicate a message that objectively contains a true threat. The Ninth Circuit alone has held that "the subjective test set forth in *Black* must be read into all threat statutes that criminalize pure speech." *United States v. Bagdasarian*, 652 F.3d 1113, 1117 (9th Cir. 2011). The case in which the Ninth Circuit first announced its interpretation of *Black*, *United States v. Cassel*, 408 F.3d 622 (9th Cir. 2005), however, like the dissent here, failed to recognize that the Supreme Court's language explaining the meaning of a true threat and of intimidation was written in the context of a statute that included a specific intent element.*

---

*Moreover, regardless of the Ninth Circuit's recent attempt to streamline its jurisprudence in *Bagdasarian*, its case law has not been consistent post-*Black*. *See United States v. Sufcliffe*, 505 F.3d 944, 961-62 (9th Cir. 2007) (declining to hold that jury instructions outlining an objective test were erroneous "[g]iven our contradictory case law on this issue"); *United States v. Romo*, 413 F.3d 1044, 1051 n.6 (9th Cir. 2005) (stating that *Cassel* did not affect the objective analysis used to determine whether a threat directed toward the president constituted a true threat); *see also United States v. Stewart*, 420 F.3d 1007, 1018 (9th Cir. 2005) ("We are not fully convinced that *Romo* properly distinguished *Cassel*, or that *Romo's* continued use of the objective 'true threat' definition is consistent with *Black's* subjective 'true threat' definition.").

*See id.* at 631. The Supreme Court gave no indication that it intended these definitions to apply outside the context of a specific intent statute—thus leaving our pre-*Black* jurisprudence, as we have implicitly recognized, untouched.

I conclude by addressing the dissent's concern that declining to impose a specific intent requirement upon every statute punishing threatening language will result in speakers being held criminally liable for "violent and extreme rhetoric" that does not reach the level of a true threat. *Post* at 46. If anything, the facts of the case before us demonstrate the contrary. Indeed, based on instructions following our standard from *United States v. Darby*, 37 F.3d 1059 (4th Cir. 1994), a jury acquitted appellant White of three counts charging him with violations of § 875(b) and (c)—despite the fact that most would find the messages contained in the charged communications to be "violent and extreme." Moreover, the district court acquitted White of an additional count as a matter of law, finding that his exhortations that a Canadian civil rights lawyer should be killed were protected speech—and we affirm. Thus, this record presents no basis for the dissent's fear that maintaining our current true threat standard will punish the undeserving.

For these reasons, I fully concur in the majority's conclusion that, when the venom spewed by White reaches a level such that a reasonable recipient would perceive it to be a true threat, the First Amendment affords him no protection.

FLOYD, Circuit Judge, concurring in part and dissenting in part:

Although we have traditionally adhered to a purely objective test for determining when a communication constitutes a true threat, the Supreme Court, in my opinion, imposed a specific intent requirement in *Virginia v. Black*, 538 U.S. 343 (2003). This superseding Supreme Court decision requires us to depart from our precedent and include a subjective compo-

nent in our true-threats analysis. Since *Black*, however, we have continued to utilize only an objective test. *See United States v. Armel*, 585 F.3d 182, 185 (4th Cir. 2009). But in doing so we have not addressed whether *Black* requires us to revisit our true-threats test. So the issue remains open. Because I think *Black* mandates that the speaker must specifically intend to threaten the victim for a communication to constitute a true threat, I respectfully dissent in part from the majority opinion.

## I.

William White challenges, among other things, his convictions under Counts 1 and 5, which charged him with violating 18 U.S.C. § 875(c). Section 875(c) proscribes "transmit[ting] in interstate . . . commerce any communication containing any threat to kidnap any person or any threat to injure the person of another." *Id.*

White contends that the district court erred in its jury instruction regarding what the government must prove to obtain a conviction under this statute.[1] Specifically, he contends the district court made an error of law when it charged the jury that, for the communications at issue to constitute true threats, the government did not have to prove that he sub-

---

[1]White's brief, in addressing this issue, does not specify whether he is challenging the jury instructions or the denial of his motion for judgment of acquittal. But, in his brief, he expressly incorporates the arguments made by the American Civil Liberties Union of Virginia, Inc. (ACLU) in its amicus brief. The ACLU clearly asserts error as to both the jury instructions and the denial of the motion for judgment of acquittal. So I consider the issue concerning the erroneous jury instruction preserved and properly before us on appeal. Rather than reviewing whether substantial evidence exists to support the jury's verdict, as we do when reviewing the denial of a motion for judgment of acquittal, *see United States v. Hackley*, 662 F.3d 671, 678 (4th Cir. 2011), it strikes me as more appropriate to determine first whether the jury convicted White pursuant to a proper jury instruction, for if not, that would require us to vacate his convictions. I therefore will address the alleged error as to the jury instruction.

jectively intended for the victims to understand them as threats, only that a reasonable recipient would deem them to be threats.

Our review of a district court's jury instructions is for abuse of discretion. *United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010). "By definition, a court 'abuses its discretion when it makes an error of law.'" *United States v. Ebersole*, 411 F.3d 517, 526-27 (4th Cir. 2005) (quoting *United States v. Prince-Oyibo*, 320 F.3d 494, 497 (4th Cir. 2003)). For the following reasons, I think the district court made an error of law when it instructed the jury that the government did not need to prove that White specifically intended to threaten the victims for the communications at issue to constitute true threats.

## II.

We must interpret statutes that criminalize pure speech consistently with the strictures of the First Amendment. *Watts v. United States*, 394 U.S. 705, 707 (1969) (per curiam). As § 875(c) criminalizes threatening speech, we must interpret it in a manner that distinguishes "[w]hat is a threat . . . from what is constitutionally protected speech." *Id.*

## A.

We have previously outlined what the government must prove to establish a violation of § 875(c). *See United States v. Darby*, 37 F.3d 1059, 1066 (4th Cir. 1994). In interpreting § 875(c), we held that it creates a general-intent crime, requiring proof of only a "general intent to threaten." *Id.* We rejected the argument that the statute imposes a specific intent requirement. *Id.* at 1062-66. We provided that "to establish a violation of [§] 875(c), the government must establish that the defendant intended to transmit the interstate communication and that the communication contained a true threat." *Id.* at 1066.

"True threats" constitute one of the "well-defined and nar-rowly limited classes of speech, the prevention and punish-ment of which have never been thought to raise any Constitutional problem." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942); *see also Black*, 538 U.S. at 358-59 (recognizing that true threats constitute one of the proscrib-able classes of speech described in *Chaplinsky*). Such speech is "of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed by the social interest in order and morality." *Id.* at 572. More specifi-cally, our interest in "protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur" out-weighs whatever negligible social value that speech constitut-ing true threats may promote. *R. A. V. v. City of St. Paul*, 505 U.S. 377, 388 (1992). For that reason, true threats fall "out-side the First Amendment." *Id.* Thus, our requirement that to obtain a conviction under § 875(c) the communication must contain a true threat is of constitutional significance because the State can proscribe such speech without violating the First Amendment. *See Black*, 538 U.S. at 359.

We have traditionally employed an objective test for deter-mining whether a communication constitutes a true threat. Under this test, if a reasonable recipient familiar with the con-text of the communication would understand it to be a threat, it is a true threat. *See Darby*, 37 F.3d at 1066; *United States v. Roberts*, 915 F.2d 889, 890-91 (4th Cir. 1990); *United States v. Maisonet*, 484 F.2d 1356, 1358 (4th Cir. 1973). This test is purely objective, as we have disavowed any require-ment that the government "prove . . . the defendant subjec-tively intended for the recipient to understand the communication as a threat." *Darby*, 37 F.3d at 1066.

Our court's precedent is, therefore, abundantly clear that neither § 875(c) nor the First Amendment imposes a require-ment that the government prove the speaker specifically intended to threaten the victim. This precedent, of course,

binds us unless it has been overruled by a superseding contrary Supreme Court decision. *See United States v. Rivers*, 595 F.3d 558, 564 n.3 (4th Cir. 2010); *Etheridge v. Norfolk & W. Ry. Co.*, 9 F.3d 1087, 1090 (4th Cir. 1993). As I shall explain, I think the Supreme Court has issued a superseding contrary decision that requires us to depart from this precedent to the extent it does not require the government to prove a specific intent to threaten for a communication to constitute a true threat.

## B.

The Supreme Court's 2003 decision in *Virginia v. Black* is a superseding contrary decision that makes our purely objective approach to ascertaining true threats no longer tenable.

At issue in *Black* were three defendants' convictions under a Virginia statute that criminalized cross burning committed "with the intent of intimidating." 538 U.S. at 348 (internal quotation marks omitted). The statute included a provision stating that the act of burning a cross constituted, on its own, "prima facie evidence of an intent to intimidate." *Id.* (internal quotation marks omitted). Accordingly, one of the defendants had been convicted pursuant to a jury instruction that charged, "[T]he burning of a cross by itself is sufficient evidence from which you may infer the required intent." *Id.* at 349 (internal quotation marks omitted). With respect to the other two defendants, one pleaded guilty and the other's conviction was obtained without the jury being instructed as to the prima facie evidence provision. *Id.* at 350-51.

After recounting the history and various purposes of cross burning as associated with the Ku Klux Klan, the Court explained why true threats do not garner First Amendment protections and may be proscribed. *Id.* at 359-60. It defined true threats as follows: "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence

to a particular individual or group of individuals." *Id.* at 359. The Court clarified that the speaker does not need to intend to carry out the threat, recognizing, as it had previously, that the State may proscribe true threats to "protect[ ] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Id.* at 359-60 (quoting *R. A. V.*, 505 U.S. at 388) (internal quotation marks omitted). The Court further explained that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Id.* at 360.

The Court held that "Virginia's statute does not run afoul of the First Amendment insofar as it bans cross burning with intent to intimidate." *Id.* at 362. Drawing on its decision in *R. A. V. v. City of St. Paul*, in which it noted that content-based discrimination is permissible "[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable," 505 U.S. at 388, the Court reasoned that "[t]he First Amendment permits Virginia to outlaw cross burnings done with the intent to intimidate because burning a cross is a particularly virulent form of intimidation," 538 U.S. at 363. This emphasis on intent is not mere surplusage. Intimidation is constitutionally proscribable as a true threat, the Court had explained, only when the speaker makes the communication "with the intent of placing the victim in fear of bodily harm or death." *Id.* at 360. Accordingly, for a statute proscribing intimidation to fall within *R. A. V.*'s exception for permissible content-based discrimination, it would need to require proof of a specific intent to make the victim fearful, not just evidence that the cross burning had that effect.

Although the majority then splintered on the constitutionality of Virginia's prima facie evidence provision, a majority of the Justices agreed that proof of an intent to intimidate was

constitutionally necessary for the Commonwealth to proscribe cross burning. A plurality[2] argued that the prima facie evidence provision was facially unconstitutional because it "strip[ped] away the very reason why a State may ban cross burning with the intent to intimidate" by obviating the Commonwealth's requirement to prove an intent to intimidate. *Id.* at 365 (plurality opinion). Recognizing that an individual can burn a cross with the intent to intimidate or to make an ideological statement, the plurality asserted that the prima facie evidence provision chilled core political speech by making it possible for Virginia to charge and convict someone who burned a cross with the intent to make an ideological statement rather than to intimidate. *Id.*

Justice Scalia, despite disagreeing with the plurality that the prima facie evidence provision was facially unconstitutional, agreed that one of the defendant's convictions had to be vacated because the jury was instructed that it could infer an intent to intimidate from the act of cross burning alone. *Id.* at 379-80 (Scalia, J., concurring in part, concurring in the judgment in part, dissenting in part). Finally, Justice Souter, joined by Justice Kennedy and Justice Ginsburg, argued that the entire Virginia statute, not just the prima facie evidence provision, constituted impermissible content-based discrimination and should be struck down. *Id.* at 380-81, 387 (Souter, J., concurring in the judgment in part, dissenting in part). Like the plurality, however, he asserted that people can burn crosses with the proscribable intent to intimidate or simply with the constitutionally protected intent to make an ideological statement, and that evidence of circumstances apart from the burning of the cross must be considered to differentiate between

---

[2]Justice O'Connor authored the plurality opinion, which Chief Justice Rehnquist, Justice Stevens, and Justice Breyer joined. Justice Scalia joined parts of Justice O'Connor's opinion, including her discussion of what constitutes a true threat, to make those parts a majority opinion, but he did not join the part addressing the constitutionality of the prima facie evidence provision.

the two purposes. *Id.* at 385-86. Significantly, despite the fractured nature of the decision, a majority of the Justices viewed proof of an intent to intimidate as constitutionally necessary to convict an individual of cross burning without violating the First Amendment.

C.

Although in *Black* the Court did not explicitly indicate that it was abrogating the purely objective standard employed by most courts—including ours—for determining whether a communication constitutes a true threat, I think its reasoning has that effect. Two aspects of the decision suggest that the Court viewed true threats as requiring proof of a specific intent to threaten. *See United States v. Cassel*, 408 F.3d 622, 631-32 (9th Cir. 2005). First, its discussion of what constitutes a constitutionally proscribable true threat contains a specific intent to threaten requirement. *See id.* at 631. Second, a majority of the Justices viewed evidence of an intent to intimidate as necessary for a defendant to be convicted for cross burning consistently with the First Amendment. *Id.* at 632.

The Court's discussion of true threats quite clearly indicates that proof of a specific intent to threaten is necessary for a communication to qualify as a true threat. Recall that it defined true threats as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359 (majority opinion). As the Ninth Circuit has recognized, "[a] natural reading of this language embraces not only the requirement that the communication itself be intentional, but also the requirement that the speaker intend for his language to *threaten* the victim." *Cassel*, 408 F.3d at 631. Moreover, the Court's statement immediately following its definition of true threats-that the speaker does not have to intend to carry out the threat—further demonstrates that it viewed true threats as containing a specific-intent requirement. *See Black*, 538 U.S.

at 359-60. The Court, having defined true threats in a manner that incorporated a specific-intent-to-threaten requirement, clarified that the specific-intent requirement does not necessitate proof of intent to carry out the threat.

To the extent that the Court's definition is susceptible to more than one interpretation,[3] however, the Court's subsequent description of what constitutes constitutionally proscribable intimidation—a type of true threat—clarifies that true threats include a specific intent to threaten requirement. The Court defined constitutionally proscribable intimidation as speech through which the "speaker directs a threat to a person or group of persons *with the intent of placing the victim in fear of bodily harm or death*." *Id.* at 360 (emphasis added). I cannot understand why intimidation would require a specific intent to threaten before being constitutionally proscribable, but all true threats would not. Therefore, in my mind, the Court's discussion of what constitutes a proscribable true threat includes a requirement that the speaker specifically intend to threaten the victim.

This interpretation is further underscored by the fact that a majority of the Justices indicated proof of an intent to intimidate was necessary for the defendants to be convicted in a manner consistent with the First Amendment. *Cassel*, 408 F.3d at 632. This, in turn, demonstrates that they viewed "intent to threaten as the *sine qua non* of a constitutionally punishable threat." *Id.* at 631. If the First Amendment did not impose a specific intent requirement, "Virginia's statutory presumption was superfluous to the requirements of the Constitution, and thus incapable of being unconstitutional in the way that the majority understood it." Frederick Schauer, *Intentions, Conventions, and the First Amendment: The Case of Cross-Burning*, 2003 Sup. Ct. Rev. 197, 217. In other

---

[3]For an overview of the competing interpretations, see Paul T. Crane, Note, "*True Threats" and the Issue of Intent*, 92 Va. L. Rev. 1225, 1256-60 (2006).

words, for the statutory provision and convictions to be unconstitutional in the way that a majority of the Justices understood them to be, the First Amendment must embody a specific-intent-to-threaten requirement. Accordingly, the constitutional deficiencies that the Justices identified in *Black* further demonstrate that the First Amendment imposes a specific-intent-to-threaten requirement.

I would therefore join those courts and scholars that have addressed *Black* and determined that it requires the government to prove that the speaker specifically intended to threaten for the communication at issue to constitute a true threat. *See United States v. Parr*, 545 F.3d 491, 500 (7th Cir. 2008) (dictum); *Cassel*, 408 F.3d at 633; *O'Brien v. Borowski*, 461 Mass. 415, 424-26 (Mass. 2012); Roger C. Hartley, *Cross Burning-Hate Speech as Free Speech: A Comment on* Virginia v. Black, 54 Cath. U. L. Rev. 1, 31, 33 (2004); Schauer, *supra*, at 217-18, Crane, *supra*, at 1269.

D.

Since *Black*, we, like the majority of circuits, have continued to employ a purely objective test for determining whether a communication constitutes a true threat. *See, e.g.*, *United States v. Mabie*, 663 F.3d 322, 333 (8th Cir. 2011); *United States v. Xiang Li*, 381 F. App'x 38, 39 (2d Cir. 2010); *Armel*, 585 F.3d at 185; *United States v. D'Amario*, 330 F. App'x 409, 413-14 (3d Cir. 2009); *United States v. Hankins*, 195 F. App'x 295, 301 (6th Cir. 2006); *United States v. Stewart*, 411 F.3d 825, 828 (7th Cir. 2005); *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 616-17 (5th Cir. 2004); *United States v. Alaboud*, 347 F.3d 1293, 1296-97 (11th Cir. 2003); *United States v. Nishnianidze*, 342 F.3d 6, 16 (1st Cir. 2003). *But see United States v. Bagdasarian*, 652 F.3d 1113, 1117 (9th Cir. 2011) ("Because the true threat requirement is imposed by the Constitution, the subjective test set forth in *Black* must be read into all threat statutes that criminalize pure speech."); *Parr*, 545 F.3d at 500 ("It is more likely, however, that an

entirely objective definition is no longer tenable."). But like most of these circuits, we have yet to address whether *Black* imposes a specific intent requirement on our true-threats analysis. *See Armel*, 585 F.3d at 185. *But see Mabie*, 663 F.3d at 332-33 (addressing *Black* but nevertheless holding that "[t]he government need not prove that [the defendant] had a subjective intent to intimidate or threaten . . . to establish that his communications constituted true threats"). And because we have never squarely addressed the issue but, at most, have assumed it, we remain free to address its merits. *See Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) ("[S]ince we have never squarely addressed the issue, and have at most assumed [it], we are free to address the issue on the merits."); *Ark. Game & Fish Comm'n v. United States*, 637 F.3d 1366, 1378 n.7 (Fed. Cir. 2011) ("We have consistently held that panel authority that does not address an issue is not binding as to the unaddressed issue."); *Passmore v. Astrue*, 533 F.3d 658, 660 (8th Cir. 2008) ("[W]hen an issue is not squarely addressed in prior case law, we are not bound by precedent through *stare decisis*."); *Fernandez v. Keisler*, 502 F.3d 337, 343 n.2 (4th Cir. 2007) ("We are bound by holdings, not unwritten assumptions."). Our precedent, therefore, does not preclude us from reaching this issue.

In light of *Black*, we should depart from *Darby*'s holding and impose a requirement that for a communication to constitute a true threat the speaker must have specifically intended to threaten the victim. To prove a true threat, the government would therefore need to satisfy a two-pronged test. *See Bagdasarian*, 652 F.3d at 1117; *Parr*, 545 F.3d at 500. First, the government would need to prove that "a reasonable recipient familiar with the context of the communication" would interpret the communication as a threat. *Darby*, 37 F.3d at 1066. Second, the government would have to demonstrate that the speaker intended for the communication to threaten the victim. This prong would require proof that "[t]he threat [was] made 'with the intent of placing the victim in fear of

bodily harm or death.'" *United States v. Magleby*, 420 F.3d 1136, 1139 (10th Cir. 2005) (quoting *Black*, 538 U.S. at 360).

As compared to a purely objective test, imposing a specific intent to threaten requirement strikes a more appropriate balance between the ideals that the First Amendment serves and the interest in protecting victims from the harms caused by threatening speech. *See* Crane, *supra*, at 1271-72. People often use violent phrases or symbols to convey ideas or displeasure, not just to threaten. They employ such speech for its emotive appeal, not just its cognitive force. *Cf. Cohen v. California*, 403 U.S. 15, 26 (1971). Violent and extreme rhetoric are no strangers to our political discourse. *See Planned Parenthood of the Columbia/Willamette Inc. v. Am. Coal. of Life Activists* (*Planned Parenthood I*), 244 F.3d 1007, 1014 (9th Cir. 2001) ("Extreme rhetoric and violent action have marked many political movements in American history. . . . [M]uch of what was said even by nonviolent participants in these movements acquired a tinge of menace."), *aff'd in part, vacated and remanded in part*, 290 F.3d 1058 (9th Cir. 2002) (en banc). Such rhetoric can constitute core political speech, even when it invokes fear and creates apprehension.

The purely objective approach allows speakers to be convicted for negligently making a threatening statement—that is, for making a statement the speaker did not intend to be threatening, but that a reasonable person would perceive as such. This potential chills core political speech. *See Rogers v. United States*, 422 U.S. 35, 47-48 (1975) (Marshall, J., concurring) ("[T]he objective interpretation embodies a negligence standard, charging the defendant with responsibility for the effect of his statements on his listeners."); *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists* (*Planned Parenthood II*), 290 F.3d 1058, 1108 (9th Cir. 2002) (en banc) (Berzon, J., dissenting) ("[A] purely objective standard for judging the protection accorded such speech would chill speakers from engaging in facially protected public protest speech that some might think, in context,

will be understood as a true threat although not intended as such."); Jennifer E. Rothman, *Freedom of Speech and True Threats*, 25 Harv. J.L. & Pub. Pol'y 283, 316 (2001) ("Punishing merely negligent speech will chill legitimate speech by forcing speakers to steer clear of any questionable speech."); Crane, *supra*, at 1273 ("Put simply, an objective standard chills speech."). "Unsure of whether their rough and tumble protected speech would be interpreted by a reasonable person as a threat, speakers will silence themselves rather than risk liability." *Planned Parenthood II*, 290 F.3d at 1108.

Under a purely objective test, speakers whose ideas or views occupy the fringes of our society have more to fear, for their violent and extreme rhetoric, even if intended simply to convey an idea or express displeasure, is more likely to strike a reasonable person as threatening. They are the ones more likely to abstain from participating fully in the marketplace of ideas and political discourse. A specific intent requirement would alleviate this chilling effect by providing speakers the solace of knowing that they cannot be convicted for negligently making a threat. It would provide them "the necessary 'breathing space' to speak freely and openly." Crane, *supra*, at 1273.

Imposing such a specific-intent-to-threaten requirement to achieve this end has a sound basis in First Amendment jurisprudence. As we have previously recognized, to prevent the chilling and potential suppression of protected speech, certain classes of speech that generally fall outside of First Amendment protections require proof of a heightened, subjective mens rea before they may be punished. *See, e.g.*, *Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 247 (4th Cir. 1997) ("[T]o prevent the punishment or even the chilling of entirely innocent, lawfully useful speech, the First Amendment may in some contexts stand as a bar to the imposition of liability on the basis of mere foreseeability or knowledge that the information one imparts could be misused for an impermissible purpose."). For example, when speakers level allegedly

defamatory falsehoods against public officials or public figures, plaintiffs seeking to recover civilly must demonstrate the speakers made the statements with actual malice. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342-43 (1974); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). And speech constitutes constitutionally proscribable incitement only if (1) the speaker possesses a specific intent to produce or incite others to imminent lawless action and (2) the speech is likely to have that effect. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." (footnote omitted)); *see also Hess v. Indiana*, 414 U.S. 105, 109 (1973) (per curiam) (holding that the defendant's speech was not constitutionally proscribable incitement in part because "there was no evidence, or rational inference from the import of the language, that his words were intended to produce, and likely to produce, imminent disorder" (emphasis omitted)); *James v. Meow Media, Inc.*, 300 F.3d 683, 698 (6th Cir. 2002) (recognizing that the *Brandenburg* test for incitement requires proof of intent); Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1095, 1193 (2005) ("[T]here is precedent for using intent . . . as part of First Amendment tests: Under the incitement test, speech that is intended to and likely to cause imminent harm is unprotected. Speech that the speaker merely knows is likely to cause imminent harm is protected." (footnote omitted)). The First Amendment, therefore, imposes heightened, subjective mens rea requirements in certain contexts to ensure "that preeminent values underlying that constitutional provision [are] not . . . imperiled." *Rice*, 128 F.3d at 247. For the reasons I have stated, I think the true-threats context warrants such a subjective-intent requirement to alleviate the chilling effect that a purely objective standard causes, and I believe the Supreme Court has recognized such a requirement.

## III.

In instructing the jury as to Counts 1 and 5, which charged White with violating § 875(c), the district court correctly charged the jury that, to convict, it had to find that the communications in question constituted true threats because the First Amendment does not protect true threats. The court instructed the jury on the objective test for determining whether a communication is a true threat. It then stated that "[t]he government does not have to prove that the defendant subjectively intended for the recipient to understand the communication as a threat."

At the conclusion of the jury instructions, White noted his objection based on his "proposed instruction on free speech and true threats." His proposed jury instruction added to the objective test a specific-intent-to-threaten requirement.[4] Although acknowledging that the district court had indicated it would not give his proposed instruction, he nevertheless indicated his desire to preserve the issue for appeal. The district court noted the proposed instruction was in the record,

---

[4]His proposed instruction stated as follows:

> The Free Speech Clause of the First Amendment does not protect statements that are "true threats." A statement made by a person constitutes a "true threat" when: first, a person makes a statements that, in context, a reasonable listener would interpret as communicating a serious expression of an intent to inflict or cause serious harm on or to the listener or the target of the communication; and second, the speaker intended that the communication be taken as a threat that would serve to place the listener or target of the communication in fear for his or her personal safety, regardless of whether the speaker actually intended to carry out the threat.

White's proposed jury instruction, which included a specific-intent-to-threaten requirement, must be distinguished from his proposed amendments to the government's proposed jury instruction. The government's proposed jury instruction disavowed a specific-intent-to-threaten requirement, and White's proposed amendments to it did not add one.

but reaffirmed that it would not give the instruction. In light of these efforts, White, in my view, adequately preserved the issue for appeal and may challenge the jury instructions here.

Because the district court's jury instruction contained an error of law in that it informed the jury it did not have to find that White specifically intended to threaten the victims, I would vacate his convictions for Counts 1 and 5. Otherwise, I am pleased to concur in the remainder of the majority opinion.